Madden, Judge,

delivered the opinion of the court:
The plaintiff sues to recover an amount, in addition to what it has been paid, for the training which it furnished to veterans during the period March 1,1950, to February 28, 1951. Under Public Law 16, 78th Congress, 57 Stat. 43, relating to the vocational rehabilitation of disabled veterans, and Public Law 346, 78th Congress, 58 Stat. 284, as amended, 59 Stat 623, relating to the education and training of veterans who were not disabled, the Government was to pay the tuition of the veterans in the schools in which they were enrolled. The question for decision in the instant case is whether the rate of tuition which the plaintiff was entitled to be paid during the year in question was the higher *345 rate which had been set in the contract for the preceding year, or the lower rate which was set, over the protest of the plaintiff, in the contract for the year in question. The plaintiff contends that, under the provisions of Public Law 266, enacted August 24, 1949, 63 Stat. 631, 652 et seq., the rate of tuition contracted for in the year preceding the year in question became “frozen” as the legal rate, and hence the purported reduction of that rate by contract for the year in question was ineffective.
The plaintiff conducted a trade school in Kansas City, Mo., which had been established at some date prior to June 22, 1944, had discontinued operations, and resumed them in June 1946. It gave courses in shoe repairing, drafting, electricity, plumbing and automotive repair, for nonveterans, for disabled veterans under Public Law 16 and for nondisabled veterans under Public Law 346. Under Public Law 16, it was necessary for a school to make a contract with the Veterans’ Administration. The plaintiff made its first such contract on June 17,1946, and it continued to train disabled veterans under a series of such contracts until February 8, 1952. It also commenced its training of nondisabled veterans under Public Law 346 in June 1946. It had no formal contract with the Veterans’ Administration for this training until March 1,1949.
Public Law 346 did not, as did Public Law 16, require that contracts be made with schools for tuition. It provided, in Section 5, that the Veterans’ Administration should pay the school the customary cost of tuition, not to exceed $500 per year. It was apparently supposed that most of the Public Law 346 students would be in established schools which would have large numbers of students whose tuition was not being paid by the Government, and that if the Government paid the same rate for veterans as other students paid, it would not be in danger of being overcharged.
The Veterans’ Administration, by September 30, 1947, seems to have come to the conclusion that some schools were establishing unreasonably high tuition rates. Schools whose students were practically all veterans could publish rates within the $500 limitation but still unreasonably high in *346 relation to the cost and value of the training, and if few nonveterans were willing to pay those rates, they could still collect them from the Government as the “customary rates.” On September 30, 1947, the Administrator of Veterans’ Affairs authorized all the regional office managers of the Administration to negotiate contracts at fair and reasonable rates with schools as to which the regional office managers thought that procedure was necessary.
Change No. 4 to Veterans’ Administration Manual M7-5 was promulgated as a Regulation on May 17, 1948. It required that contracts be negotiated, beginning July 1, 1948, with certain schools operating for profit, including those which came into existence after June 22, 1944, the date of enactment of Public Law 346, and those which had increased their tuition rates in excess of 25 percent. The Kansas City Regional Office of the Veterans’ Administration concluded that Change No. 4 did not apply to the plaintiff because it had been in existence prior to June 22,1944.
On February 18, 1949, effective March 1, 1949, Change 9 to Manual M7-5 was promulgated. It extended Change 4 by requiring schools to submit cost data and contract for fair and reasonable rates if they had not been in continuous operation since June 22,1944. It also made the new requirements applicable to nonprofit schools, which meant that many more schools would be interested in and affected by the regulation. Change 9 applied to the plaintiff since, as we have seen, though it had existed before June 22,1944, it had discontinued operations and not resumed them until June 1946. The plaintiff was then required to submit cost data, and it entered into a series of annual contracts covering the period March 1, 1949, to February 1952, at which time it ceased to operate.
Many schools refused to submit to the requirements of Change 9, or to enter into contracts, hoping that the courts would invalidate Change 9, There was much confusion. The Veterans’ Administration sought to have the substance of Change 9 incorporated in a statute. To the provision of the bill which was to be the Independent Offices Appropriation Act, 1950, appropriating funds for the education and train *347 ing of Public Law 346 veterans, a proviso was added containing in substance the language of Change 9. On the complaint of representatives of the schools that it would be burdensome for them to have to file cost data year after year, a further proviso was added “freezing” the rate of the most recent contract after contracts had been executed for two successive years. The Independent Offices Appropriation Act, 1950, containing the provisions referred to above, was enacted August 24,1949. It was Public Law 266.
On February 28,1950, the plaintiff executed a contract with the Veterans’ Administration covering the education of veterans under Public Law 346 for the succeeding year, the year involved in this suit. It will be remembered that it had executed a contract a year earlier, pursuant to Change 9. The Government says that the March 1, 1950, contract was only the second contract, and that the lower rates embodied in it were the rates that became frozen, under Public Law 266. The plaintiff says that the contract made in 1949 under Change 9 was the second contract, or at least the second contract, since it had been making Public Law 16 contracts for the rehabilitation of disabled veterans since 1946, and also because other earlier writings which it had submitted concerning Public Law 346 veterans were contracts within the meaning of Public Law 266.
We consider first the question of whether the Public Law 16 contracts were contracts which froze the rates embodied in them, within the meaning of Public Law 266. In that Act, which made appropriations for all the independent offices of the Government, a separate part was applicable to the Veterans’ Administration. That part was divided into eight items, the appropriation for each item being separate from the others, and the funds not being transferable from one item to another. Two items relate to payment for vocational rehabilitation of disabled veterans under Public Law 16. One item with the heading “Readjustment benefits” appropriates money for payment for education and training benefits under Public Law 346. In this item are contained the provisions for the determination of fair and reasonable rates which are the subject of interpretation in this case.
*348 The statute, on its face, would not suggest that the contracts mentioned in it as having the effect of freezing rates, making them ipso facto fair and reasonable, would be contracts other than those relating to the subject matter to which the language in question is a proviso, i. e., the expenditure of money for the education of veterans under Public Law 346. The impetus for the insertion of the proviso came from the Veterans’ Administration, which sought to cure what seemed to it to be an evil. If Public Law 16 contracts had the effect of freezing rates, the statute would have had little to operate on, since such contracts had been made from the beginning of the operation of Public Law 16, and rates in most schools would have been frozen before the enactment of Public Law 266, and even before the promulgation of Change 9.
Contracts under Public Law 16 were not arrived at in such a way as to safeguard the public funds, which was the intent of Public Law 266. The number of disabled veterans rehabilitated under Public Law 16 was only a relative handful compared with the number schooled under Public Law 346. The Veterans’ Administration could not have afforded to make the careful study of cost data and value of the training for the relatively small saving which would result from keeping the Public Law 16 tuition down to a reasonable figure. Public Law 16 contracts were not, in fact, established by bargaining nor on the basis of cost data. They merely embodied the tuition rates charged to nonveteran students.
The plaintiff claims that certain other writings which passed between it and the Government before the contract of March 1, 1949 was made, were “contracts” within the meaning of the freezing provision of Public Law 266, and that for that additional reason its 1949 contract was at least the second contract, and its rates were the frozen rates. In the early administration of Public Law 346, the Finance Division of the Veterans’ Administration Regional Offices paid the invoices of the schools training veterans after examining catalogs, memoranda and other literature of the schools which indicated what the schools were charging nonveteran students, i. e., what their customary rate of tuition was. It was *349 often difficult to learn, with assurance of accuracy, what these customary rates were. Forms were developed for obtaining this information from the schools, and the forms were improved as experience indicated how they could be improved. In 1947 “Institution Charge Data” sheets became the form for the submission by the schools of the required information. These sheets, called Form VASL7-1167, contained spaces for tuition rates, length of course, rate of compensation charged for handling of books, and a list of student holidays. The form was to be executed by the president of the school and had a space for the signature of the Contract Supervisor in the Training Facilities Section of the Eegional Office of the Veterans’ Administration. These forms when filled out merely gave information as to what the schools were charging nonveteran students. They were not contracts. The signature of the Contract Supervisor was an authorization to the Finance Division to pay the rates certified in the form as certified by the school. The school could have unilaterally decreased or increased its tuition rates and, if it had amended its form VASL7-1167, it would have been legally entitled to the changed rates. This situation continued until Change 9 to the Veterans’ Administration Manual M7-5 was promulgated, effective March 1, 1949, which was also the effective date of the plaintiff’s first formal contract.
On the basis of the materials considered above, it seems to follow that neither the Public Law 16 contracts nor the VASL7-1167 forms which the plaintiff executed before March 1, 1949, were contracts within the meaning of the freezing provision of Public Law 266. The plaintiff, however, urges that the Congressional intent was otherwise, and cites legislative history which, it says, proves its contention.
After the enactment of Public Law 266 on August 24,1949, the Veterans’ Administration on September 8,1949, promulgated Instruction No. 1 to that law, which instruction specifically excluded Public Law 16 contracts from the category of contracts which would freeze rates. On September 23 there was introduced in the Senate and referred to the Committee on Labor and Public Welfare, S. 2596 which provided that contracts under Public Law 16, or any other agreements *350 in writing on the basis of which, tuition payments had been made from the Treasury of the United States should be considered contracts for the purpose of the freezing provisions of Public Law 266. S. 2596 provided that it should be retroactive to August 24,1949. The Veterans' Administration expressed to the Committee its objections to S. 2596, both orally and in writing. S. 2596 was approved by the Committee and was passed by the Senate on October 12, 1949. On October 14 the Committee on Veterans’ Affairs of the House of Bep-resentatives reported S. 2596 and recommended that it pass. On October 18 the bill was considered by the House under a request for a unanimous consent rule and was presented for immediate passage. A Congressman objected and consideration was deferred. Congress adjourned on October 20.
On May 11,1950, the House passed S. 2596. As passed by both the Senate and the House, the bill contained the words, “effective August 24,1949”. As it emerged from conference, and was finally enacted, it stated that it was effective from the date of enactment. It was enacted on July 13,1950. The House Managers stated in the Conference Beport:
The provisions in Public Law 266, which now govern many of the subjects contemplated by this Act, are repealed effective the date of the enactment of this Act. Previously the provision had been in both bills that it would be repealed August 24,1949.
S. 2596, when enacted, became Public Law 610, 64 Stat. 336.
On August 16,1950, the Veterans’ Administration issued a writing interpreting Public Law 610. This interpretation aroused protest and on September 13 the Senate Committee on Labor and Public Welfare recommended approval of Senate Concurrent Besolution No. 107. It was passed unanimously by the Senate on the next day. It related to Public Law 610, and referred to the statement of the House Managers quoted above. It may be susceptible of the interpretation that Public Law 610 was intended to apply the freezing provisions of Public Law 266 to Public Law 16 contracts made before the enactment of Public Law 610. There was no action in the House of Bepresentatives on Senate Concurrent Besolution No. 101. On August 27, 1951, Senate *351 Resolution No. 124, with the same content as Senate Concurrent Resolution No. 107 was passed by the Senate.
Some other statements of members of Congress bearing on the intent of Congress intended to be expressed in Public Law 266 and Public Law 610 have been called to our attention. Recalling that S. 2596 which became Public Law 610 contained language expressly making it retroactive to the date of enactment of Public Law 266, but that, as finally enacted, it contained equally express language making it effective from the date of enactment, we see no room for interpretation as to whether or not it was to be retroactive. Whatever may have been the opinion of individual members as to the intent of Congress, the Congress as an entity, with those who were managing the legislation for it fully aware of the problem, made its choice. It would be quite improper for us to reverse that choice, to write an effective date into the legislation different from the one that Congress, by no stretch of the imagination inadvertently, wrote into the statute.
The plaintiff produced as a witness a former member of the United States Senate who was Chairman of the Veterans’ Subcommittee of the Senate Labor and Public Welfare Committee which considered the bill which ultimately became Public Law 610. This witness gave oral testimony as to what was intended by Public Law 610. At first blush it might seem that this would be the ideal way to learn the intent of a legislative body, to get it straight from the mouth of a responsible member of the legislature. Second thought leads to the conclusion that the practice would be intolerable. A legislature speaks through statutes, and, in cases where the statutes require interpretation, through committee reports and debates. No member of a legislature, outside the legislature, is empowered to speak with authority for the body. If he may testify voluntarily, other members of his legislative body with different views or different recollections may be summoned to give their differing versions. The debate, which, so far as the lawmaking body is concerned, should have been ended by the enactment of the statute, would be transferred to the court, with disturbing possibilities of embarrassment and friction.
*352 It is only fair to the plaintiff to say that the Government, in the case of Alfred C. Bergh, et al. v. United States, 132 C. Cls. 564, originated this practice, so far as we can recall. In neither that case nor this should the witness have been tendered, or the testimony admitted.
Our conclusion is that the plaintiff’s tuition rates were frozen by the contract dated February 28,1950, V3032v-325. The parties have stipulated that, that being the case, the Government is entitled to recover $10,533.94 on its counterclaim.
The plaintiff’s petition is dismissed. The defendant may have a judgment for $70,533.94 on its counterclaim.
It is so ordered.
Laramore, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, the National School of Aeronautics, a Missouri Corporation, d/b/a National Trade School and located principally at 2610 Grand Avenue, Kansas City, Missouri, a profit corporation, was engaged during the period pertinent to this action in providing a program of vocational rehabilitation for disabled veterans pursuant to the provisions of Public Law 16, 78th Congress, enacted March 24.1943, 57 Stat. 43, Veterans [Regulations 1 (a), Part VII, 38 U. S. C. Chapter 12A (p. 720, 1954 Ed.) and the education and training of other than disabled veterans under the provisions of Public Law 346, 78th Congress, enacted June 22.1944, 58 Stat. 287, Veterans Kegulation 1 (a), Part VIII, 38 U. S. C. A. Chapter 12A (p. 725, 1954 Ed.). The National Trade School provided courses in shoe repairing, general drafting- (which might be taken complete or divided into machine or architectural drafting), productional drafting (including two courses relating to mechanical or architectural engineering, respectively), electricity, plumbing, and master automotive technician.
*353 2. Tlie school began the instruction of disabled veterans, under Public Law 16, on June 17, 1946, under a formal contract with the Veterans’ Administration and continued under a series of formal contracts to furnish such instruction until February 8,1952. The training of other than disabled veterans, under Public Law 346, was commenced by the school during the month of June 1946. Said training for nondisabled veterans was approved by the Veterans’ Administration Regional Office, Kansas City, Missouri, and was conducted- without formal contract from June 1946, through February 1949. Commencing March 1, 1949, formal contracts were required by the Veterans’ Administration and the school trained so-called Public Law 346, or non-disabled, veterans under a series of formal contracts during the period March 1, 1949, through February 8, 1952. The following schedules list the formal contracts and other documents which reflect the tuition rates paid by the Veterans’ Administration to the National Trade School for the vocation rehabilitation of disabled veterans in accordance with the provisions of Public Law 16, and for the education and training of nondisabled veterans under the provisions of Public Law 346, during the period June 17,1946, through February 8,1952.
I
VOCATIONAL REHABILITATION UNDER PUBLIC LAW 16, FORMAL CONTRACTS

*354

*355 3. Veterans’ Administration Instruction No. 3-A Public Law 16, 78th Congress, dated May 29, 1945 sets forth the operating instructions of the Veterans’ Administration with respect to the vocational rehabilitation of disabled veterans. Public Law 16 requires that all vocational rehabilitation be accomplished under formal written contracts with the Veterans Administration. Instruction No. 3-A embodied this requirement but authorized the Manager of the Eegional Offices to contract with public or private institutions for vocational rehabilitation at the customary rates charged by the schools to nonveteran students. Paragraph 17 of the Instruction No. 3-A provided as follows:
* * * In cases where the school publishes a catalog, the most practicable way of setting forth the charges is by appending the school catalog and other publications and making direct reference thereto. If this is not practicable, the charges will be typed into the proposal form.
All Public Law 16 contracts for vocational rehabilitation of disabled veterans entered into with plaintiff, in accordance with established procedure, embodied the customary tuition rate charged to nonveteran students; the rate was not established by bargaining or on the basis of cost data. The designation “negotiated contract”, appearing in the upper right-hand corner of Public Law 16 contracts entered into by the Veterans’ Administration with the National Trade School, was placed thereon in conformance with the regulations of the General Accounting Office to distinguish those documents from contracts arrived at through the submission of bids. This designation was required for audit purposes by the General Accounting Office, and it was placed on all Veterans’ Administration contracts regardless of how they were arrived at.
4. The original operating instruction of the Veterans’ Administration covering payment of tuition for education and training of veterans, other than disabled, under Public Law 346, is contained in Veterans’ Administration Instruction No. 6, Title II, Public Law 346, 78th Congress, 10 F. R. 4502; 38 C. F. R. 36.245, p. 3938 (1945 Supp.).
Public Law 346 requires that schools providing education and training be paid their “customary cost of tui *356 tion.” Prior to September 1947 neither Public Law 346, nor Instruction No. 6 required or provided that education and training of veterans should be conducted under contract, when the cost of a course was less than $500, excepting short, intensive courses and correspondence courses. Paragraph 1 of Instruction No. 6 reads as follows:
Authorization, for Payment of Tuition, Incidental Fees, and Books, Supplies, Equipment and other Expenses. The manager of the regional office of the Veterans Administration is authorized to pay to the educational or training institution for each eligible person enrolled in a full-time or part-time course of education or training such charges for tuition, incidental fees, necessary books, supplies, equipment, and other expenses as are customarily made other students pursuing the same or comparable courses except as otherwise stated in this instruction, and provided that such payment shall not exceed $500 for a full-time course for an ordinary school year.
Paragraph 2 (a) of Instruction No. 6 reads:
Charges for tuition will be those customarily made other students pursuing the same or comparable courses, as set forth in the published catalogs or bulletins of the school or college, except as otherwise stated herein. In the event an institution does not publish a bulletin, a responsible official of the institution will individually certify to the manager of the regional office within whose territory the institution is located the customary charges for tuition for the courses offered.
5. Prior to June 14, 1946, payment of invoices submitted by schools engaged in the education and training of Public Law 346 veterans, was effected by the Finance Division of the Veterans’ Administration Eegional Offices, based upon catalogs, memoranda or other literature furnished by the school reflecting its customary rate of tuition to non-veteran students as provided in paragraph 2 (a) to Instruction No. 6. This required an administrative review of such literature to be performed by the finance personnel of the Veterans’ Administration Eegional Offices each time vouchers were submitted. There was considerable difficulty in verifying such invoices from the miscellaneous tuition rate data then being provided by the schools for the purpose of informing *357 the Veterans’ Administration of their customary tuition rates. To simplify the procedure for ascertainment of the customary rate, forms were developed by the Finance Division of the Veterans’ Administration Eegional Office in Kansas City and furnished to trade schools, including the National Trade School, for the purpose of obtaining course information and a statement of the customary tuition rates under a uniform, orderly system. During June and July of 1946, the National Trade School submitted to the Eegional Office six such forms listing the courses for training of veterans under Public Law 346 and setting forth the tuition rates which had been approved by the State of Missouri, Department of Education. A slight modification of the original form was subsequently formulated by the Finance Personnel of the Kansas City Eegional Office. During April 1947, the National Trade School submitted to the Kansas City Eegional Office four of the modified forms which reflected increases in rates as approved by the State of Missouri school approval authority. All of these forms, sometimes referred to as transmittal sheets, identified the school and set forth the name and length of the particular course and contained a certified statement executed by the president of the National Trade School as to the rate of tuition and method of payment desired. These forms do not contain any agreement respecting rendition of training or payment for training, nor do they specifically provide that the school undertakes to do anything. They contain no statement as to the period of time during which the rates and courses set out therein shall remain in effect. Further, these forms were not executed by any official of the Veterans’ Administration. Shortly thereafter, during 1947, the use of such forms was discontinued. They were superseded by “Institution Charge Data” sheets, Form VASL 7-1167.
6. The “Institution Charge Data” form originated in another branch area of the Veterans’ Administration and was promulgated by the Deputy Administrator of the St. Louis Branch Office following a Central Office conference where it was decided, in the interest of uniformity, to standardize the information form. This standard form was exhibited and a recommendation made for its use in all branch areas by all *358 regional offices. The Veterans’ Administration Eegional Office, Kansas City, Missouri, which performed all necessary Federal functions respecting the training rendered to veterans by the plaintiff was within the jurisdiction of the St. Louis Branch Office during the period discussed in this paragraph. In initiating the use of the “Institution Charge Data” sheets, the St. Louis Branch Office issued an instruction designated BO 9, Circular No. Sl-36 respecting use of the form by the Eegional Offices in the branch area, which reads as follows:
ESTABLISHMENT OE STANDARD PROCEDURES EOR MAINTAINING INFORMATION RELATIVE TO THE COST OF COURSES OF instruction AT INSTITUTIONS NOT UNDER CONTRACT
1. Purpose. — A study has been made of the methods used by the different regional offices in this area to obtain correct data pertaining to the cost of courses of instruction at high schools, trade schools, business colleges, and other schools not under contract with the Veterans Administration. In order that the procedures followed and forms used for this purpose will be uniform throughout the area of Branch No. 9, VASL Form 7-1167 “Institution Charge Data” has been prepared for use by the Training Facilities Section in each regional office. A sample of the form is attached.
2. Procedures. — a. It will be the responsibility of the Training Facilities Section to secure data relative to the cost of courses at institutions for the education and training of veterans not under contract with the VA, to verify the correctness of such charges, and to furnish information to the Finance Officer regarding the allowable amounts which may be paid to such institutions when no contract has been negotiated.
b. Each institution which provides education and training for veterans in the regional office area and which does not have a contract for education under Public Law 846 will be furnished a sufficient number of copies of VASL Form 7-1167, together with an appropriate letter of instruction pertaining to the use of this form. The institution will prepare an original and two copies in accordance with instructions contained on the form and submit them to the regional office concerned.
o. Upon receipt at the regional office of three copies of this form properly executed and authenticated by the institution, the information contained on the form *359 will be verified by the Supervisor of the Contract Unit of the Training Facilities Section. If VASL Form 7-1167 is properly completed and if all the charges shown are allowable, the three copies of the form will be approved and signed by the Contract Supervisor and the following action will then be taken:
(1) The original will be forwarded to the Finance Officer.
(2) The duplicate copy will be returned to the institution.
(3) The third copy will be retained in the Training Facilities Section.
3. Form Supply. — An initial supply of forms will be mailed to each regional office. Further supplies may be procured through normal supply channels. ( SL7)
By direction of the Deputy Administrator:
John R. Murphy,

Assistant Deputy Administrator.

The “Institution Charge Data” sheet contained space for tuition rates, and certain additional information, including length of course, rate of compensation charged for the handling of books, and a list of holidays recognized for students. The language of the forms provided for execution under certification by the president of the particular school and transmittal to the Manager of the Veterans’ Administration Regional Office, for attention of the Training Facilities Section. The form also included a space for the signature of the Veterans’ Administration Contract Supervisor in the Training Facilities Section of the Regional Office. The forms did not bear contract numbers or any form of contractual designation, and did not include any statement that training was being offered nor that any service would be rendered by the school. They do not reflect an agreement respecting rendition of training or an agreement regarding payment for training rendered or to be rendered. Upon receipt in the regional office of the executed form, the Contract Supervisor verified the accuracy of the statements contained therein as reflecting the tuition being charged to nonveteran students and indicated such verification had been accomplished by signing the form. The form was then transmitted to the Finance Division where it was utilized for the purpose of verifying the accuracy of the rates set *360 forth, on invoices submitted by the school. Similar forms were used by schools throughout the United States.
7. The “Institution Charge Data” sheets submitted by the school during the period July 1,1947, through September 20, 1948, were the representations made by the school as to what were its customary rates of tuition for that period. They contained the same tuition rates as the immediately preceding transmittal form letters which they replaced. The tuition rates set forth in the transmittal form letters and the “Institution Charge Data” sheets were determined by the National Trade School with the approval of the State of Missouri school approval authority and represent rates of tuition being charged to nonveteran students. The rates specified in the forms were not negotiated with the Veterans’ Administration, and the Veterans’ Administration had no alternative under the statute and the then existing regulations but to pay whatever the school charged, up to a rate of $500 for an ordinary school year, with certain exceptions not here material. At any time during the period of July 1, 1947, through June 30, 1948, the school was privileged to increase or decrease its rates, within the statutory limitation of $500, without approval of the Veterans’ Administration, subject only to the effective period of any existing Public Law 16 contract providing lower rates for Public Law 16 rehabilitation training. Prior to July 1, 1948, no Veterans’ Administration regulations or instructions provided for negotiation of rates as the legal term “negotiation” is generally used or understood, for either vocational rehabilitation under Public Law 16, or education and training under Public Law 346, in the case of a school such as the National Trade School. The submission of a new form letter or “Institution Charge Data” sheet advising of any revision by the school in tuition rates within the statutory limits would have been binding upon the Veterans’ Administration respecting payment for training of Public Law 346 veterans in accordance with such rates.
8. Under date of May 11, 1948, a letter from the plaintiff was forwarded to the Manager of the Kansas City Regional Office, certifying that the tuition rates set forth therein for the specified courses were “the customary charges of this *361 institution for these courses” which “became effective April 21, 1947, and have been in effect without interruption to the present date.” The courses and rates listed therein are identical with those contained in the form transmittal letters and to those in the “Institution Charge Data” sheets.
9. By a telegram dated September 30,1947, the Administrator of Veterans’ Affairs authorized all regional office managers to negotiate formal contracts at a fair and reasonable rate for Public Law 346 training where necessary to correct abuses on the part of some schools in establishing unreasonably high tuition rates. This communication was not mandatory but left to the discretion of regional office managers the matter of determining which schools should be required to enter into contracts on a fair and reasonable basis. No contract was required or negotiated with the National Trade School on the basis of the telegram.
10. Veterans’ Administration Manual M7-5 contains certain specific requirements where contracts are to be negotiated with a school for the education and training of Public Law 346 veterans. Section 9 of the manual requires the use of a formal contract, VA Form 7-1903 (b), a sample of which is printed in the manual. The institution’s tuition charges were not submitted on Form 7-1903 (b). Paragraph 110 of this manual requires the execution by both parties of six copies of education and training contracts. Only three copies of the “Institution Charge Data” sheets were originally required, that number being subsequently raised to four copies. Paragraph 113 (b) of the manual requires a review and prior approval by the appropriate Veterans’ Administration Branch Office of all contracts under Public Law 346. It was never required that the “Institution Charge Data” sheets furnished by the plaintiff school be submitted to the St. Louis Branch Office for prior approval. The so-called “contract supervisor” of the Kansas City [Regional Office, who signed the “Institution Charge Data” sheets had authority to prepare contracts but was without authority to execute contracts.
11. Change No. 4 to Veterans’ Administration Manual M7-5 was promulgated as a [Regulation on May 17, 1948, 13 F. R. 2695; 38 C. F. R. 36.287, requiring that contracts be *362 negotiated with, profit schools on a fair and reasonable basis beginning July 1, 1948, for training of Public Law 346 veterans, as well as Public Law 16 veterans, in the case of certain schools, including those which came into existence after June 22, 1944, and those which had increased their tuition rates in excess of 25'%. The Administrator’s telegram of September 30,1947, and Change 4 to Veterans’ Administration Manual M7-5 were issued because many schools were increasing their tuition rates to just under the $500 limitation without regard to the actual value of the training offered and new schools were arbitrarily claiming customary rates just within the $500 limitation. Following receipt of Change 4, discussions were held by the Kansas City [Regional Office Training Facilities Section personnel with officials of the National Trade School to determine the possible necessity of requiring a negotiated contract with that institution for the training of Public Law 346 veterans. No audit was made by the Veterans’ Administration officials of the books and records of the school, but certain data submitted by the school was examined by the regional office personnel who determined that the school was not subject to the requirement for submission of cost data leading to negotiation of a contract on a fair and reasonable rate. Conferences between officials of the plaintiff school and officials of the Veterans’ Administration resulted in a determination that the school could be considered to be an institution established prior to June 22,1944, which had not substantially increased its rates under the criteria established in Change 4.
Change 9 to the Veterans’ Administration Manual M7-5 was promulgated February 18, 1949, effective March 1, 1949, (14 F. R. 381; 38 C. F. R. 21.570, 1949 Supp.) carrying forward the provisions of Change 4 and extending the requirement for submission of cost data and determination of a fair and reasonable rate to all schools not in continuous operation since June 22, 1944, and to nonprofit institutions. The pertinent provisions of Change 9 read, as follows:
92. DETERMINATIONS WHEN CONTRACT IS REQUIRED
a. Contracts under Public Law 16 are required before payment of charges can be made to educational institutions for the rehabilitation of eligible veterans. Those *363 provisions of subparagraph b below, relative to rates in contracts with other than nonprofit institutions, are equally applicable to contracts for the rehabilitation of part VII trainees. (See par. 45a (1).)
b. It will be necessary for a contract to be negotiated under Public Law 346 by the VA [for] payments for tuition, fees, books, supplies, equipment, and other necessary expenses [ ] to the institution for the training of part VIII trainees under the following circumstances: £ * % #
(6) With nonprofit institutions, except for institutions of higher learning which are nonprofit as defined in paragraph 55, and with other than nonprofit institutions for all courses for which the claimed customary charges do not exceed the rate of $500 for a full-time course for an ordinary school year where the majority of the enrollment of the institution in the courses in question consists of veterans in training under Public Laws 16 and 346,78th Congress, as amended, and where one of the following conditions prevails:
(a) The institution has been established subsequent to June 22,1944.
(b) The institution, although established prior to June 22,1944, has increased by more than 25 percent its total charges for the course to all students subsequent to that date. An institution will be considered to have increased its total charge for the course if it has increased its rate per hour or has lengthened, extended, or otherwise changed the course so that the resultant total charge therefor has been increased.
(c) The institution, although established prior to June 22,1944, has not been in continuous operation since that date.
(d) The institution, although established prior to June 22, 1944, has added unrelated courses which were not provided for nonveteran students prior to June 22, 1944, but as to such courses only.
This paragraph, namely, paragraph 92b, shall be effective March 1, 1949. In the negotiation of contracts with other than nonprofit institutions pursuant to the provisions of subparagraphs (a), (b), (c), and (d) of paragraph 92b (6), it will be necessary for the institution to submit cost data; agreed contract rates will not exceed either claimed customary charges or rates determined by the VA to be fair and reasonable in accordance with the provisions of paragraph 80b. In the negotiation of contracts with nonprofit institutions pursuant to the provisions of subparagraphs (a), (b), (c), and
*364 (d) of paragraph 92b (6), agreed contract rates will not exceed either claimed customary charges or those determined to be fair and reasonable in accordance with the provisions of paragraph 80a.
Pursuant to the provisions of Change 9, supra, the National Trade School was required to submit cost data and the school entered into the first of a series of negotiated formal contracts covering the period from March 1, 1949, to February 1952, for the training of Public Law 346 veterans.
12. Many schools resisted the requirement of Change 9, that their tuition rates be determined upon the basis of cost data, and many refused to sign contracts until the question had been decided by the courts. Accordingly, when the “Independent Offices Appropriation Act, 1950,” containing an appropriation for the Veterans’ Administration, was being considered by the Congress, the Veterans’ Administration suggested that the substance of Change 9 be incorporated into the pending Bill, which ultimately became Public Law 266. To that provision of the Bill which appropriated funds for the education and training of Public Law 346 veterans, a proviso was added containing in substance the language of Change 9 to Veterans’ Administration Manual M7-5, requiring a fair and reasonable rate determination in certain described cases. On the complaint of representatives of the schools that it would be burdensome for them to have to file cost data year after year, a proviso was added freezing the rate of the most recent contract after contracts had been executed for two successive years. The purpose of requiring contracts for two successive years was to give the Veterans’ Administration an opportunity to negotiate with an institution for at least two contracts, since in many cases the first year’s cost data submitted by the schools were merely estimates and did not reflect actual cost experience. Under the heading “Veterans Miscellaneous Benefits,” the Bill contained a separate appropriation provision for the vocational rehabilitation of disabled veterans under Public Law 16, Part VII, of Veterans’ Administration Regulation No. 1 (a),
13. Public Law 266, 81st Congress, enacted August 24, 1949, 63 Stat. 653, 38 U. S. C. A. Chapter 12 contains the following pertinent provisions:
*365 Beadjustment benefits: For the payment of benefits to or on behalf of veterans as authorized by titles II, III, and Y, of the Servicemen’s Beadjustment Act of 1944, $2,197,503,000, to be immediately available and to remain available until expended: Provided, That no part of this appropriation for education_ and training under title II of the Servicemen’s Beadjustment Act, as amended, shall be expended for tuition, fees, or other charges, or for subsistence allowance, for any course elected or commenced by a veteran on or subsequent to July 1, 1948, and which is determined by the Administrator to be avocational or recreational in character. For the purposes of this proviso, education or training for the purpose of teaching a veteran to fly or related aviation courses in connection with his present or contemplated business or occupation shall not, in the absence of substantial evidence to the contrary, be considered avocational or recreational when a certificate in the form of an affidavit supported by corroborating affidavits by two competent disinterested persons, has been furnished by a physically qualified veteran stating that such education or training will be useful to him in connection with earning a livelihood: Provided further, That no part of this appropriation for education and training under title II of the Servicemen’s Beadjustment Act, as amended, shall be expended subsequent to the effective date of this Act for subsistence allowance or for tuition, fees, or other charges in any of the following situations:
(1) For any veteran for a course in an institution which has been in operation for a period of less than one year immediately prior to the date of enrollment in such course unless such enrollment was prior to the date of this Act;
(2) For any course of education or training for which the educational or training institution involved has no customary cost of tuition, until a fair and reasonable rate of payment for tuition, fees, or other charges for such course has been determined. In any case in which one or more contracts providing a rate or rates of tuition have been executed for two successive years, the rate established by the most recent contract shall be considered to be the customary cost of tuition notwithstanding the definition of “customary cost of tuition” as hereinafter set forth. If the Administrator finds that any institution has no customary cost of tuition he shall forthwith fix and pay or cause to be paid a fair and reasonable rate of payment for tuition, fees, and other charges for the *366 courses offered by such, institution. Any educational or training institution which is dissatisfied with a determination of a rate of payment for tuition, fees, or other charges under the foregoing provisions of this paragraph shall be entitled, upon application therefor, to a review of such determination (including the determination with respect to whether there is a customary cost of tuition) by a board to be known as the “Veterans’ Tuition Appeals Board” consisting of three members, appointed by the Administrator for such purpose. Such board shall be subject, in respect to appointment, hearings, appeals and all other actions and qualifications, to the provisions of sections 5 to 11, inclusive, of the Administrative Procedure Act, approved June 11, 1946, as amended. The decision of such board with respect to all matters shall constitute the final administrative determination. In no event shall the board fix a rate of payment in excess of the maximum amount allowable under the Servicemen’s Readjustment Act, as amended. The term “customary cost of tuition” as employed herein and in paragraph 5, part VIII, Veterans Regulation Numbered 1 (a), as amended, is regarded as that charge which an educational or training institution requires a nonveteran enrollee similarly circumstanced to pay as and for tuition for a course, except that the institution (other than a nonprofit institution of higher learning) is not regarded as having a “customary cost of tuition” for the course or courses m question in the following circumstances :
(а) Where the majority of the enrollment of the educational and training institution in the course in question consists of veterans in training under Public Laws 16 and 346, Seventy-eighth Congress, as amended; and
(б) One of the following conditions prevails:
1. The institution has been established subsequent to June 22,1944.
2. The institution, although established prior to June 22,1944, has not been in continuous operation since that date.
3. The institution, although established prior to June 22, 1944, has subsequently increased its total tuition charges for the course to all students more than 25 per centum.
4. The course (or a course of substantially the same length and character) was not provided for nonveteran students by the institution prior to June 22, 1944, although the institution itself was established before June 22, 1944: Provided further, That nothing in the foregoing proviso shall be construed to affect adversely any *367 legal rights which have accrued prior to the date of enactment of this Act, or to affect payments to educational or training institutions under contracts in effect on such date.
* * * * *
Veterans’ miscellaneous benefits: For the payment of burial awards authorized by Veterans’ Administration [Regulation Numbered 9 (a), as amended, and for supplies, equipment, and tuition authorized by part VII and payments authorized by part IX of Veterans’ Administration Regulation Numbered 1 (a), as amended, $75,330,000, to remain available until expended.
14. The terms “vocational rehabilitation” and “education and training” are words of art, as used in Public Laws 16 and 346, 78th Congress, in regulations relating thereto and in correspondence and conversations respecting veteran training programs. The term “vocational rehabilitation” refers solely to the program for the rehabilitation of disabled veterans under the provisions of Public Law 16 and the term “education and training” refers solely to the education or. training of nondisabled veterans under the provisions of Public Law 346.
The Veterans’ Administration interpreted the so-called “rate freezing” provision of Public Law 266 as referring only to education and training under Public Law 346, and not encompassing the “vocational rehabilitation” of disabled veterans under Public Law 16. Instruction No. 1 to Public Law 266, 81st Congress, dated September 8, 1949 was promulgated by the Veterans’ Administration and provides in paragraphs (b) (1) as follows:
Contract Requirements. Existing VA regulations requiring contracts on a fair and reasonable basis will continue in full force and effect except that in any case in which one or more contracts providing a rate or rates of tuition under Public Law 346 (not under Public Law 16) have been executed in accordance with VA regulations for two successive years in calendar time, except as provided in subparagraph (2) immediately following, the rates established by the most recent contract shall be considered to be the customary cost of tuition applicable to eligible veteran enrollees notwithstanding the definition or “customary cost of tuition as provided in R & P R-10467 (paragraph 55.1, M7-5).” Therefore, *368 no further fair and reasonable cost determination will be required by the VA with respect to the contract rates which are considered to be the customary cost of tuition established by the most recent contract where contracts have been executed on a fair and reasonable basis covering a period of two successive years.
The instruction specifically excluded contracts for vocational rehabilitation under Public Law 16 from the specified series of contracts for establishment of a “frozen” rate. This instruction was never rescinded. Instruction 1-A to Public Law 862, 80th Congress, and to Public Law 266, 81st Congress, promulgated September 1, 1949, related to matters of approval of avocational training and contained nothing relating to the “rate-freezing” provisions of Public Law 266. Instruction 1-A was rescinded October 5, 1949.
15. The Veterans’ Administration’s annual reports to Congress for the years 1948-1949 reflect an estimated saving to the Government in tuition costs of approximately $35,000,000 annually due to the promulgation of Changes 4 and 9 to Manual MI-5, requiring negotiated contracts for Public Law 346 education and training. They also show that disabled veterans receiving vocational rehabilitation under Public Law 16 contracts, constituted only six to eight percent of the entire veteran student body.
16. The Congress enacted Public Law 610, 81st Congress, effective July 13,1950 (64 Stat. 336, Veterans Regulation No. 1 (a), Part VIII, paragraph 11 (d), 38 U. S. C. A. Chapter 12A (p. 735, 1954 Ed.)). Senate Substitute Bill S2596, which contained language virtually identical to the “rate-freezing” provision of Public Law 610, as the bill was introduced on September 23, 1949 and as it was passed in the Senate on October 12, 1949, and in the House of Representatives on May 11, 1950, specifically provided that the pending legislation would be effective on August 24,1949, the effective date of the prior Public Law 266. In the Conference Committee of the two Houses of Congress the effective date of the bill was changed by amendment to the date of its enactment. In that form it was enacted on July 13, 1950.
Public Law 610 repealed Public Law 266, but reenacted the substance of many of its provisions. However, it contained an express provision that the word “contract” in the *369 freezing provision should include Public Law 16 contracts or any other agreements in writing on the basis of which tuition payments had been made from the Treasury of the United States.
Plaintiff introduced in evidence many exhibits including statements from the Congressional Becord of members of both Houses of the Congress in an effort to establish the legislative intent behind the enactment of Public Law 610. Included in these exhibits were copies of Senate Bes. 2596, which provided that Public Law 610 would be effective August 24, 1949 (the effective date of Public Law 266), Senate Bes. 124 and Senate Concurrent Bes. 107. The two resolutions last mentioned were accompanied by reports from the Committee on Labor and Public Welfare of the Senate. The headings of these two reports were identical and were as follows:
Providing a certification of the Legislative Intent of the Congress in Public Law 610, Eighty-first Congress, to amend the Educational Training Provisions of the Servicemen’s Beadjustment Act of 1944.
17. The National Trade School submitted cost data and entered into Contract No. V3032v-166, based thereon, with the Veterans’ Administration for the training of Public Law 346 veterans for the period March 1,1949, through February 28,1950. The following year cost data were again required by the Veterans’ Administration and a similar negotiated contract, No. V3032v-325, was entered into at substantially reduced rates for all courses covering the period March 1, 1950, through February 28, 1951. Following further negotiations with the school, Contract No. V3032v-478 was entered into for the training of Public Law 346 veterans covering the period March 1, 1951, through February 28, 1952. This contract contains the following provision:
Tuition: Charges for tuition shall be made at rates and subject to conditions as follows:
It is hereby agreed that without either party waiving any legal rights under Public Law 266 or Public Law 610, 81st Congress, and without prejudice to either party’s rights thereunder, effective March 1, 1951, the rates to be paid at all times that the enrollment in the institution shall be less than 2,000 students shall be those *370 set forth in Table A below, and at all times that the enrollment is 2,000 or in excess thereof, the rates shall be those set forth in Table B below, provided, however, that in the event it shall be decided by the Veterans’ Education Appeals Board or, in the event of Court action, by the Courts, that the rates stated in Contract V3032v-166, covering the period March 1,1949, to February 28,1950, are the customary cost of tuition within the meaning of either Public Law 266 or Public Law 610, 81st Congress or both, payments under Contract V3032v-325, covering the period March 1, 1950, to February 28, 1951, and all subsequent contracts shall be adjusted accordingly, but that if it be so determined that the rates of the Contract numbered V3032v-325, covering the period March 1, 1950, to February 28,1951, are the customary cost of petition as above defined, the payments made and to be made under this contract shall be adjusted to such determination.
The tuition rates set forth under Table A were the rates contained in Contract V3032v-166 and the rates set forth in Table B were the same as the rates which were contained in Contract V3032v-325. Payments to the school were required under the provisions of this contract (V3032v-478) at the higher rates prescribed therein identical to those contained in Contract V3032v-166, subject to a final judicial determination as to whether the rates of Contract No. V3032v-325, or Contract No. V3032v-166 had become the customary or “frozen” rate under the provisions of Public Law 266. It is agreed by the parties that, should the court determine, as plaintiff contends, that the rates of Contract No. V3032v-166 became the “frozen” rate, plaintiff would be entitled to recover the sum of $232,441.80 representing the difference between the tuition paid under Contract No. V3032v-325 during the period from March 1, 1950, through February 28, 1951, and that which would be payable at the rates prescribed in Contract No. V3032v-166, plus $17,979.81 withheld by the Veterans’ Administration for training during the last three months of the period covered by Contract No. V3032v-478. The school ceased operations during February 1952. If it is determined, as defendant contends, that the rates provided for tuition in Contract No. V3032v-325 became the “frozen” rate applicable to the training provided under Con *371 tract No. V3032v-478, defendant would be entitled to recover under its counterclaim the amount of $70,533.94.
18. The plaintiff’s claim has been the subject of administrative consideration by the Veterans’ Education Appeals Board, a new Board created by Public Law 610 and appointed by the President, and by the Veterans’ Administration. Under date of September 11,1950, the National Trade School filed an appeal with the Veterans’ Education Appeals Board presenting a single issue, namely, whether the plaintiff had acquired a customary or “frozen” rate at the tuition rates set forth in Contract No. V3032v-166 or Contract V3032v-204. The initial decision by the Hearing Examiner supported the plaintiff’s contention. This decision was appealed by the Administrator of Veterans’ Affairs, and the Appeals Board on January 19, 1952, rendered its decision which denied the plaintiff’s contention.
The plaintiff school petitioned for a rehearing and the petition was denied by the Board on February 14, 1952.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is therefore dismissed; and that the defendant is entitled to recover on its counterclaim, and it is therefore ordered and adjudged that defendant recover of and from the plaintiff the sum of seventy thousand five hundred thirty-three dollars and ninety-four cents ($70,533.94).