Laramore, Judge,
delivered the opinion of the court:
This action arises under section 400 of the Servicemen’s *313 Readjustment Act of 1944 (Public Law 346), 58 Stat. 284, 287, and the Veterans’ Education and Training Amendments of 1950, 64 Stat. 336. In short, plaintiff’s claim is that the Veterans Administration did not reimburse it in the full amount as required by statute when paying the plaintiff for the costs charged veterans enrolled in its trade school courses. The defendant has filed a counterclaim which, by agreement of the parties, is not considered at this time and reserved for future determination.
Originally plaintiff began as a small college of engineering, having an enrollment of 130 to 200 students. In March of 1949, plaintiff entered into an agreement to purchase the assets of the Technical Crafts Corporation and its subsidiary, the Hemphill Diesel and Automotive Schools (hereinafter referred to respectively as Technical and Hemphill), which agreement was to be effective retroactively as of June 1,1948. Technical operated trade schools offering courses in plastering, tilesetting, electrical appliances, refrigeration and radio repair, upholstering, and master craftsman watchmaking. Its subsidiary, Hemphill, offered a course in diesel engine mechanics. After completing this purchase, plaintiff had an enrollment of 1,282 students in its trade schools, and 136 students in its college of engineering. Of this enrollment of 1,418 students, all but 50 were veterans. For the year beginning July 1, 1948, the plaintiff charged over $2,000,000 tuition, of which only slightly more than $85,000 was attributable to the college of engineering.
In 1944 Congress passed the Servicemen’s Readjustment Act, sufra, which provided in section 400(b) that the Veterans Administration would reimburse qualified educational institutions for the “customary cost of tuition” charged their enrolled veterans. Under this statute, West Coast University, Technical, and Hemphill, which were seperate institutions at that time, received their total charged tuition from the Veterans Administration for each veteran enrolled in their courses. In 1948 the Veterans Administration issued a regulation known as Change 4 to its Manual M7-5 to be effective on July 1, 1948. Change 4 provided that only those schools which were nonprofit institutions were entitled to receive reimbursement for the costs of enrolled veterans in an amount *314 equal to tlieir customary costs of tuition. The schools, other than nonprofit institutions, embraced under Change 4 were required to negotiate written contracts with the Veterans Administration for the fair and reasonable costs of educating their enrolled veterans. The purpose of this new regulation was to prevent unscrupulous operators of profit-making institutions from taking advantage of Public Law 346, by charging higher tuition than they normally could expect to receive if the veterans themselves had to pay the tuition instead o.f it being paid for them by the Veterans Administration.
Plaintiff, West Coast University, was a tax exempt educational institution under the provisions of the Internal Revenue Code of 1939, 26 U.S.C. §101(6). Rulings by the Internal Revenue Service on November 4,1947, before plaintiff acquired the assets of Technical and Hemphill, and on February 21, 1949 and January 8, 1951, after plaintiff acquired the assets of Technical and Plemphill, had established plaintiff’s tax exempt status. Technical and Hemphill were both operated for profit prior to the sale of their assets to plaintiff. West Coast University was operated by a Board of Trustees which included some of the officials of Technical. In addition, the president of West Coast University was also the president and controlling stockholder of Technical, and both institutions had the same vice-president and secretary-treasurer.
After Change 4 was announced, plaintiff agreed to enter into leasing arrangements with Technical and Hemphill whereby plaintiff would operate their trade schools, retaining the same management, personnel, and facilities. This agreement took place on July 30, 1948, and the leasing arrangements were to be retroactively effective as of July 1, 1948, which was the effective date of Change 4. The leasing arrangements also were conditioned upon the retention by plaintiff of its tax exempt status under the Internal Revenue Code. The purpose of these leasing arrangements was to allow the trade schools operated by Technical and Hemphill to take on the nonprofit status already established by plaintiff and thereby continue to be reimbursed by the Veterans Administration for their customary cost of tuition as they had been prior to Change 4, instead of then negotiating and *315 entering into contracts with, the Veterans Administration for the fair and reasonable costs allocable to their enrolled veterans. However, the proposed leasing arrangements never went into effect, and on March 80,1949 the parties entered into the previously referred to agreement whereby plaintiff purchased the assets of Technical and Hemphill. The sales agreement, like the proposed leasing arrangements, was conditioned upon plaintiff retaining its tax exempt status, and similarly was intended to be retroactive, this time to June 1,1948.
The first issue to be decided in this case is whether plaintiff’s purchase of the assets of Technical and Hemphill permitted the trade schools to take on a nonprofit status and thereby avoid the requirements of Change 4 regarding profit-making schools. Plaintiff contends that such is the case. The defendant contends otherwise and primarily rests its case upon the formal contracts governing the period July 1, 1948 to February 28,1949, which were signed by the plaintiff and the Veterans Administration on July 6, 1950. These contracts culminated a long series of negotiations between the parties.
Immediately after the proposed leasing arrangements between plaintiff and Technical and Hemphill had been agreed to on July 30,1948, plaintiff notified the Veterans Administration that it had taken over the operation of the trade schools and intended to operate them pursuant to the provisions of Public Law 346. The Veterans Administration replied that the plaintiff had to first show the approval of the California Department of Education for the transfer, and then show that the Bureau of Internal Revenue considered the plaintiff and affiliated trade schools both to be tax exempt under the provisions of section 101(6) of the Internal Revenue Code, supra, before the Veterans Administration would consider the schools to be nonprofit. Plaintiff was not able to obtain the approval of the Internal Revenue Service for the proposed lease arrangements, and therefore abandoned them in lieu of the purchase agreement as previously mentioned. However, before such abandonment took place, defendant made partial payments to plaintiff for the costs of educating the veterans enrolled in the trade schools.
*316 According to the provisions of Change 4, no payments were to be made to an educational institution when a contract setting forth fair and reasonable rates was required and such contract or written agreement between the Veterans Administration and the institution had not been completed. However, in November of 1948 the defendant consented to pay plaintiff for instruction given students in the trade schools for the months of July, August, and September of 1948. Interim agreements for these months were signed, whereby rates to plaintiff would eventually be determined on a fair and reasonable cost basis, but at the time the agreements were entered into, defendant paid plaintiff its customary rates. These interim agreements further provided that final payment to the plaintiff for services rendered would be withheld until a formal contract or agreement was entered into, and that any amounts paid to plaintiff under the interim agreements which were in excess of the final agreed upon payments would be subject to refund to the defendant. On May 27, 1949, the original interim agreements were extended to cover plaintiff’s customary costs through February 28, 1949. At that time it was agreed that plaintiff’s customary costs from July 1, 1948 to February 28, 1949 were $500,000. The defendant paid plaintiff this amount less $80,000 which it withheld pending final determination of the ultimate amount due plaintiff.
Plaintiff contends that it is entitled to be considered a nonprofit institution under Change 4 for the period of time from July 1,1948 to February 28,1949, and that therefore it should receive its customary cost of tuition from the Veterans Administration for operation of its trade schools as well as its College of Engineering. Thus plaintiff seeks to recover the $80,000 which the defendant Veterans Administration withheld. Plaintiff bases its contention on the fact that the Internal He venue Service recognized it to be a tax exempt institution on November 4, 1947, February 21, 1949, and January 8,1951, which specifically included the period July 1, 1948 to February 28, 1949, when plaintiff owned the trade schools. It is noted that Change 4 in defining a nonprofit institution refers to the definition given in section 101(6) of *317 the Internal Revenue Code, supra, regarding tax exempt organizations.
Section 101(6) of the Internal Revenue Code of 1939 provides in this respect that corporations organized and operated exclusively for educational purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual, shall be tax exempt.
The defendant maintains that recognition of tax exemption by the Internal Revenue Service is not binding upon it in determining whether an institution is nonprofit or not, and that in any event the formal contract entered into on July 6,1950 governs this question.
We agree with the plaintiff on this issue. The determination by the Internal Revenue Service that plaintiff was a tax exempt institution during the period in question appears to us to be the more authoritative ruling on the issue as to whether plaintiff was a nonprofit institution. What agency was better equipped or better qualified to pass on this question than the Internal Revenue Service ? Asa matter of fact, the Internal Revenue Service was the only body clothed with authority to make a determination that plaintiff was tax exempt. It follows that only a nonprofit organization could be tax exempt within the meaning of the Code. It is important to note that Change 4 refers to section 101(6) of the Internal Revenue Code, supra, as giving the definition of a nonprofit institution. Although it may be that a ruling by the Internal Revenue Service is not binding on the Veterans Administration on this particular question, under the circumstances of this case there is no evidence in fact that plaintiff was not operated as a nonprofit institution during the period in controversy. We thus accept the Internal Revenue Service’s determination on this question. Furthermore, we do not believe that the contract signed on July 6,1950, which was concluded after nearly two years of negotiations, acts to bar plaintiff’s recovery on this count. Since, in our view, contracts setting forth fair and reasonable rates were not required, the plaintiff’s statutory right to he reimbursed for the customary costs of tuition cannot be abrogated by an agreement entered into after hard bargaining on the part of *318 the defendant. Art Center School v. United States, 136 Ct. Cl. 218, 142 F. Supp. 916 (1956).
As a final argument, the defendant contends that plaintiff is barred from recovering any amounts that might have been originally due it, by the six year statute of limitations, because plaintiff first filed its petition in this court on May 13, 1955, whereas the period for which reimbursement is sought ended on February 28, 1949. The defendant cites United States National Bank of Portland v. United States, 129 Ct. Cl. 777, 125 F. Supp. 250 (1954), to support its contention that the statute began running on February 28, 1949 due to the fact that the amounts owing plaintiff must be deemed to have accrued during that time. With this reasoning we do not agree. It should be noted that in United States National Bank of Portland v. United States, supra, the contracts were signed before the services were rendered. In the present case it was not until May 27, 1949 at the earliest, when the final interim agreement was signed, that the defendant withheld approximately $80,000 from the plaintiff, and the final contract governing this period was not signed until July 6, 1950. Both of these dates are within six years of the filing of this petition, and in our opinion the statute did not start to run until the negotiations between the parties terminated. Rosario v. United States, 106 F. 2d 844 (App. D.C.).
Consequently, under the facts and circumstances above outlined, plaintiff is entitled to recover the amount withheld by the Veterans Administration.
The next issue in this controversy concerns the period from March 1, 1949 to June 30, 1952. The relations between the Veterans Administration and the plaintiff during this period were governed by regulation Change 9 to Manual M7-5, which went into effect on March 1,1949. Change 9 provided in pertinent part that the customary cost of tuition would not be regarded as having been established by any institution or any part of an institution (broken down by courses) which had subsequent to June 22, 1944 been operated on a profit basis before ultimately becoming a nonprofit institution or becoming absorbed by a nonprofit institution. Change 9 also provided that under certain conditions nonprofit institutions *319 which were not also institutions of higher learning would not be regarded as having a customary cost of tuition. Consequently the defendant determined that plaintiff’s college of engineering was still entitled to be reimbursed for its customary tuition, but that the trade school courses having been operated for profit subsequent to June 22,1944, and not being courses of higher learning, could only receive reimbursement by entering into contracts for the fair and reasonable costs of educating the veterans. Thus the defendant under Change 9 required the plaintiff to enter into contracts for its trade school courses as it did under Change 4. Certain of these contracts were entered into on July 6, 1949 and covered the period from March 1, 1949 to June 30, 1949 and also the period from July 1, 1949 through June 30, 1950. Contracts were also entered into on July 24,1950 for the period July 1, 1950 through June 30, 1951, and on July 19, 1951 for the period July 1,1951 through June 30,1952. Plaintiff is now suing for the difference between what it considers its customary costs of tuition as opposed to the amounts it received under the contracts as the fair and reasonable costs incurred by the enrolled veterans.
The plaintiff alleges that defendant’s application of Change 9 to require written contracts for the trade school courses is erroneous. It says that under Change 9 as written, either all the courses in the University or none could be reimbursed for the customary costs. Plaintiff further contends that Change 9 does not permit some of the courses in a certain institution to be so treated and not others, because the institution as a whole receives the status of nonprofitability and is tax exempt in its entirety. As a second allegation, plaintiff claims that Change 9 is an invalid regulation conflicting with the statutes.
Plaintiff contends that Change 9 as written would not permit the defendant to reimburse plaintiff for its customary costs of tuition for its college of engineering (which was done) and then require contracts for the reimbursement of the fair and reasonable costs of enrolled veterans in the plaintiff’s trade school courses. With this contention we cannot agree. Change 9 specifically provided that those courses offered by a nonprofit institution which subsequent to June *320 22,1944 bad been offered by a profit institution before being taken over by a nonprofit institution, would not be regarded as presently being offered by a nonprofit institution for purposes of reimbursement. Furthermore, we do not regard the plaintiff’s trade school courses as being part of an institution of higher learning. Although Change 9 does not specifically state that the customary costs of tuition of certain courses of higher learning will be paid, while other courses in the same institution which are not considered to be of higher learning will only be reimbursed in an amount equal to the fair and reasonable costs, we believe that this is the only reasonable and consistent way to interpret this part of Change 9, particularly in view of the other pertinent provisions in Change 9. Plaintiff cites to us many instances where prominent institutions of higher learning also offered courses which are vocational in nature or courses which would not otherwise be considered examples of higher learning. However, the nature of plaintiff’s educational institution is unlike that of the large universities called to our attention by plaintiff. Plaintiff’s institution, after its purchase of the trade schools, was primarily oriented toward instruction in courses other than those of higher learning. The only courses traditionally considered to be of higher learning were offered in plaintiff’s college of engineering, and the students enrolled in these courses comprised less than 10 percent of plaintiff’s total enrollment. In addition, the tuition received by plaintiff for the year commencing July 1, 1948 for its engineering students amounted to less than 5 percent of that received by plaintiff for all its courses. As is evident from the circumstances of plaintiff’s purchase of the assets of the trade schools, the purchase was primarily designed to permit the trade schools to avoid the conditions of Change 4 and Change 9. As we determined earlier in this opinion, plaintiff’s purchase was successful in complying with the literal conditions of Change 4. However, we cannot say this regarding Change 9. In our opinion the contracts required by the Veterans Administration for reimbursement of the costs of veterans enrolled in the plaintiff’s trade school courses were required by Change 9.
We also disagree with plaintiff’s contention that the *321 Veterans Administration’s issuance of Change & was at variance with the statutory policy established by Congress. In Metropolitan Training Center, Inc. v. Gray, 188 F. 2d 28 (CCA-DC) it was held that the Veterans Administrator had the authority to issue Change 4 in order to effectively implement Public Law 346 and prevent abuse of the law by profit making institutions whose enrollment primarily consisted of veterans, and whose tuition rates were primarily determined by the fact that the Veterans Administration was paying the tuition. Change 9[1] was a further implementation of Change 4 to close up the loophole which resulted when profit making institutions, seeking to maintain their excessive tuition rates, became incorporated into nonprofit institutions and, in many instances, as in the present case, the complexion of the resulting institutions, while still retaining their nonprofit status, was greatly changed. Once having become a part of a nonprofit institution, these former profit institutions still charged excessive tuition rates, but instead of siphoning off their excessive income as profits and dividends, they took them in the form of extraordinarily large salaries. This is what occurred in the present case. The Veterans’ Education Appeals Board, in determining the fair and reasonable costs allowable to plaintiff, discovered that plaintiff’s administrative salaries were out of line with those of other educational institutions. Through studies the Board had determined that approximately 65 percent of the administrative costs of other institutions went for salaries. However, in plaintiff’s case its salaries were greatly in excess of this percentage. Furthermore, the Board found that the plaintiff was overstaffed with administrative personnel and that its president and a relative of his received unusually high salaries. Therefore, in determining the fair and reasonable costs to be allocated to plaintiff for salaries, the Board allowed it 70 percent of its administrative costs. We believe the Board’s determination in this respect to be supported by substantial evidence. Accordingly, we hold that Change 9, as applied to this case, was a valid exercise of the Veterans’ Administrator’s regulatory authority to implement Public Law 346 and prevent abuse of the statute. We are supported in this determination by National School of Aeronautics, Inc. v. United *322 States, 135 Ct. Cl. 343, 346-347, 142 F. Supp. 933 (1956), which discusses the original controversy regarding the issuance of Change 9 and the subsequent enactment of the Veterans’ Education and Training Amendments of 1950, 64 Stat. 336, which contain “in substance the language of Change 9.”
Under the facts and circumstances outlined above, it is our opinion that plaintiff cannot recover for the period covered by Change 9, i.e., March 1, 1949 to June 30, 1952, in excess of the fair and reasonable costs set forth in the contracts.
The next issue before the court is whether the plaintiff is entitled to recover interest in the amount of $2,613.40 which it paid on bank loans. In our opinion these loans were made necessary because of the delay by the Veterans Administration in making prompt payment, and provision is made for payment thereof under paragraph 80(b)(7) of Change 9. The Commissioner of this court has made a finding, which we approve and adopt, that disallowance of this item by the Veterans’ Education Appeals Board was arbitrary and unwarranted. Consequently, we hold that plaintiff is entitled to recover this amount.
The Veterans Administration disallowed an item of interest in the amount of $12,455.73 which was paid by reason of the purchase by plaintiff of the trade schools in question. We can think of no reason why the defendant should be liable for interest on a debt not incurred to carry on an established business but to acquire further assets. It was not an administrative expense and not an expense within the spirit and meaning of paragraph 80(b) (7) of Change 9. Nor are we told of any statutory authority for recovery of this item. Consequently, we can find nothing arbitrary in the refusal of the Veterans’ Education Appeals Board to refund this item and we hold, therefore, that plaintiff is not entitled to recover on this particular claim.
The final issue is whether plaintiff is entitled to a 10 percent profit instead of 6 percent as allowed by the Veterans’ Education Appeals Board.
We think the allowance or disallowance of such a claim is within the province of the Veterans’ Education Appeals Board. Furthermore, it seems incongruous for a nonprofit institution to seek profit. The only reason therefor would be *323 to use the profit in paying salaries to employees, which, we have already found to have been excessive. We say this because all other expenses must have been figured in the customary cost of tuition or the fair and reasonable cost of educating veterans. Consequently, we can find nothing arbitrary or unwarranted in the disallowance of this item by the Veterans’ Education Appeals Board, and we deny plaintiff’s claim in this respect.
Plaintiff is entitled to recover the sum withheld under Change 4 and is entitled to recover the interest paid by it as above described, and judgment is entered to that effect. The exact amount of recovery will be determined pursuant to Rule 38 (c) of the Rules of this court.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a California corporation which was authorized to furnish education and training to eligible veterans under the Servicemen’s Readjustment Act of 1944, as amended, Public Law 346, 78th Congress, 58 Stat. 284-287 (38 U.S.C. 703a and Chap. 12A, Veteran’s Regulation No. 1(a), Part VIII).
2. Plaintiff has brought these actions to obtain an increase in the tuition rates embodied in a series of contracts with the Veterans Administration (hereafter referred to as VA) relating to the following courses: (1) plastering, (2) tileset-ting, (3) diesel engine mechanics, (4) electrical appliances, refrigeration and radio repair, (5) upholstering, and (6) master craftsman watchmaking. Specifically, plaintiff claims that it is a nonprofit institution of higher learning and is accordingly entitled, under the appropriate regulations, which are set out herein, to its customary cost of tuition rather than the rates granted by the VA on the basis of cost data. In the alternative, it claims that the rates were not fair and reasonable.
It is defendant’s contention that, with respect to the courses in issue, plaintiff is not a nonprofit institution of *324 higher learning; and that, in any event, the tuition rates were established pursuant to an agreement between the parties based on a valid consideration. Defendant has also filed three counter-claims for alleged overpayments made to plaintiff arising out of the said contracts and the decision of the Veterans’ Education Appeals Board in the administrative proceedings brought by plaintiff for a review of the tuition rates.
3. Court of Claims case No. 198-55 relates to the training of veterans under VA contracts Nos. V3044V-673 and V3044V-674 with plaintiff for the period from July 1, 1948, through June 30,1949, and under VA contracts Nos. V3044V-675 and V3044V-678 with plaintiff for the period July 1, 1949, through June 30, 1950. Court of Claims case No. 246-57 relates to the training of veterans under VA contract No. V3044V-690 for the period July 1,1950, through June 30, 1951, and VA contract No. V3044V-910 for the period July 1,1951, through June 30,1952.
It was agreed that the two claims would be consolidated for purposes of trial. It was further agreed, as reflected in the pretrial memorandum filed August 29, 1961, that the trial in the first instance would be limited to the issues of law and fact relating to the right of plaintiff to recover, reserving the determination of the amount of recovery, if any, and the amount of defendant’s offsets, if any, for further proceedings. It was also agreed that the following issues are involved in these claims:
(1) Are the plaintiff schools entitled to a “customary” tuition rate?
(2) If not so entitled, what is a fair and reasonable tuition rate under the contracts for the period involved in this litigation?
4. Effective July 1, 1948, the VA issued its regulation, Change 4, to VA Manual M7-5, which defined the conditions under which a school could have a customary cost of tuition and provided that schools which did not have such a customary cost of tuition would be obliged to negotiate written contracts for fair and reasonable rates based on cost data. It provided in part as follows:
*325 106. DETERMINATION' WHEN CONTRACT IS REQUIRED
It will be necessary for a contract to be negotiated by the VA before payments for tuition, fees, books, supplies, equipment, and other necessary expenses are made to the institution for the training of part VIII trainees under the following circumstances:
a. Nonprofit Institutions
ill Courses of 30 Weeks or More.
(a) When the institution elects and is permitted to receive payment of other than customary tuition, on the credit hour rate (alternative 4).
(b) Contracts will be made effective with the beginning of the first term, semester or quarter subsequent to the date the institution submits a formal request for payment of adjusted tuition on the basis of alternative 4, provided such request is approved by the VA.
(2) Courses of Less Than 30 Weeks. (See pars. 66 through 68.) A contract must be negotiated with a nonprofit institution in all cases where the customary charges exceed the rate of $500 for a full-time course for an ordinary school year. Where the customary charges for such courses have not been increased subsequent to June 22, 1944, in what appears to be an unreasonable amount for the services rendered, the Manager may contract to pay such customary charges without the submission of cost data. In all other cases, contract rates must not exceed the rates determined to be fair and reasonable in accordance with the provisions of paragraph 80.
b. Other Than Nonprofit Institutions (Courses of 30 weeks or more and courses of less than 30 weeks)
(1) Contracts will be required when the customary charges exceed the rate of $500 for a fulltime course for an ordinary school year. In the negotiation of such a contract, it will be necessary for the school to submit cost data. Agreed contract rates will not exceed rates determined by the VA to be fair and reasonable in accordance with the provisions of paragraph 80.
(2) Effective July 1, 1948, contracts will be required when the customary charges do not exceed the rate of $500 for a full-time course for an ordinary school year where a majority of the enrollment of the institution consists of veterans in training under Public Laws 16 and 346, as amended, and where one of the following conditions prevails:
(a) The institution has been established subsequent to June 22,1944.
*326 (b)Tlie institution, although established prior to June 22, 1944, has increased its charges to all students subsequent to that date to an amount which, in the judgment of the Manager, appears to be an unreasonable amount for the services rendered. In general, an increase of less than 25 percent will not be considered unreasonable. However, if, in the judgment of the Manager, an increase of less than 25 percent in the case of any institution is considered to be unreasonable, the Manager may submit a full report of the facts to the Assistant Administrator for Yocational Eehabilitation and Education through the appropriate branch office and request a ruling as to whether or not a cost determination should be made.
In the negotiation of contracts as required in subpara-graphs (a) and (b) above, it will be necessary for the school to submit cost data. Agreed contract rates will not exceed rates determined by the VA to be fair and reasonable in accordance with the provisions of paragraph 80.
(3) Contracts will not be required when the customary charges do not exceed the rate of $500 for a full-time course for an ordinary school year provided any one of the following conditions prevail:
(a) When the customary charges of an institution established prior to June 22, 1944, do not exceed the rate of $500 for a full-time course for an ordinary school year and the institution has not increased its charges subsequent to June 22, 1944, to an amount which, in the judgment of the Manager, appears to be unreasonable for the services rendered.
(b) Where the maj ority of the enrollment of the institution consists of students not in training under Public Laws 16 and 346, as amended.
(c) Where an institution which was established prior to June 22, 1944, and has been in continuous operation since that date and has not increased its charges to students, veterans, and nonveterans alike, to an amount in excess of the charges customarily made by the institution for the same or similar courses prior to June 22, 1944.[1]
5. Prior to July 1, 1948, the effective date of Change 4, plaintiff consisted solely of a small nonprofit college of en *327 gineering, with an enrollment ranging from 130 to 200 students. It offered courses in electrical engineering, mechanical engineering, applied physics, and applied mathematics. Its graduates have 'been accepted in the California Institute of Technology and the University of California without examination and given full graduate standing.
On November 4, 1947, the Bureau of Internal Eevenue issued a ruling that West Coast University was exempt from Federal income tax under the provisions of section 101(6) of the Internal Eevenue Code in that it was organized and operated exclusively for educational purposes. The ruling also contained the following statement:
Accordingly, you will not be required to file income tax returns unless you change the character of your organization, the purposes for which you were organized, or your method of operation. Any such changes should be reported immediately to the collector of internal revenue for your district in order that their effect upon your exempt status may be determined.[2]
6. On July 1, 1948, the effective date of Change 4, West Coast University was operated by a Board of Trustees which included some of the officials of a 'California company called Technical Crafts Corporation (hereafter referred to as Technical) which contolled a number of trade schools in California, New York, Illinois, and Tennessee. The president of West Coast University was also president and controlling stockholder of Technical, and the two institutions also had the same vice president and secretary-treasurer.
7. Technical and its subsidiary, Hemphill Diesel and Automotive Schools (hereafter referred to as Hemphill) operated the trade school courses set out in finding 2 which were to have been conducted by West Coast University as of July 1, 1948. Technical did not operate West Coast University.
Technical gave courses in electrical appliances, refrigeration and radio repair, and upholstering in its General Trade School No. 1, the courses in plastering and tilesetting in its *328 General Trade School No. 2, and the course in master craftsman watchmaking in its School of Watchmaking. Hemp-hill gave the course in diesel engine mechanics. High school graduation was not required for any of the courses except master craftsman watchmaking. However, veterans of World War II who failed to have a high school diploma but expressed a desire to take the course in master craftsman watchmaking were accepted for training in that course. Examination of the curricula in these courses indicates that they were all trade courses and not college courses.[3]
8. Plaintiff’s charges for tuition to nonveterans, if any, for the above courses, were:
Plastering_$294.00
Tilesetting _ 294.00
Diesel engine mechanics- 499. 80
Electrical appliances, refrigeration and radio repair_ 470.40
Upholstering _ 352.80
Master craftsman watchmaking_ 825.00
The courses in tilesetting, plastering, upholstering, and electrical appliances were not offered before June 22, 1944. Prior to that date a course in watchmaking was offered that was 12 months in length for a tuition of $515. After July 1, 1946, the course in watchmaking was discontinued and a course in master craftsman watchmaking was instituted. This course was 64 weeks long, and the tuition was $825. Prior to June 22, 1944, a course in diesel engine mechanics was also offered. This course was 4 months long, and the tuition was $325. After September 15, 1947, the length of the course was increased to 34 weeks, and the tuition was increased to $499.80.
9. On July 30, 1948, West Coast University agreed to enter into leasing arrangements with Technical and Hemphill, which conducted the aforesaid six trade courses, whereby West Coast University would operate the trade schools. The same management, personnel, and facilities were to be retained. The leasing arrangements were to be made retroactive to July 1, 1948, and were conditioned upon the reten *329 tion by West Coast University of its nonprofit, tax-free status under the Internal Revenue Code. At the time the leases were agreed upon, West Coast was insolvent, with assets of $14,362.29 and liablities of $15,729.87. The proposed leasing arrangements never became effective (finding 10).
The facts indicate and the Veterans’ Education Appeals Board held in its final decision in Docket No. 115, that the proposed leasing arrangements (and subsequent sale of assets) were accomplished for the purpose of enabling Technical and Hemphill to utilize the nonprofit status of West Coast University for their trade school operations to meet the new situation created by Change 4.
10. By letter dated July 31, 1948, West Coast University notified the VA that it had taken over the operation and control of all school divisions and courses formerly conducted by Technical, and that application to operate those schools under the provisions of Public Law 346, 78th Congress, had been filed with the California State Department of Education, Division of Readjustment Education, Los Angeles, on July 26,1948.
On August 9,1948, the VA replied to West Coast University’s letter of July 31, as follows:
Receipt is acknowleged of your letters, both dated July 31, 1948, in which you stated that the West Coast University has taken over the operations of the schools formerly operated by Hemphill Diesel and Automotive Schools, Inc., and the Technical Crafts Corporation, effective July 1, 1948, and that application to operate said schools under the provision of Public Law 346. was filed with the State Department of Education, Division of Readjustment Education, Los Angeles.
Until such time as this office is advised by the State Department of Education of the change in ownership and operation and approval of the West Coast University to offer such courses formerly given by the schools being taken over and a photostatic copy of Form Letter 912M, Treasury Department, Commissioner, of Internal Revenue indicating that the West Coast University and the affiliated schools are all exempt from federal income tax under the provision of Section 101 (6) of the Internal Revenue Code, the schools in question will be considered *330 as originally approved by tbe state as other than nonprofit and subject to the provision of Change 4 to Veterans Administration Manual M7-5.
Mr. Albert H. Monk, who was Director of Training Facilities at VA, testified that he was advised orally by an official of the Internal Bevenue Service that it would not recognize West Coast University as tax exempt under the proposed lease agreement. He could not recall the date of his personal visit to the Internal Bevenue Service.
The Internal Bevenue Service took no official action with respect to the leasing arrangement, which never became effective. Failing to obtain the approval of the Internal Revenue Service for the proposed lease arrangement, plaintiff abandoned the arrangement, and there was substituted therefor an agreement for the sale of the assets of Technical to West Coast University, as set out in finding 14 herein.
On October 6, 1948, by letter, defendant notified West Coast University that the determination of November 4, 1947, by the Bureau of Internal Bevenue, to the effect that West Coast University was exempt from filing income tax returns, had been made on the basis of evidence concerning the character of this organization, its purpose, and method of operation at that time. The letter stated further:
* * * The provision of the exempt status rendered by the Bureau of Internal Bevenue requires that any change in the character of your organization, the purpose for which you were organized, or your method of operation, should be reported immediately to the Collector of Internal Bevenue for your district in order that their effect upon your exempt status may be determined.
Accordingly, this office must consider the other entities recently transferred from the Technical Crafts Corporation to the West Coast University as other than nonprofit and subject to provisions of Change 4 to VA Manual M7-5.
A review of the courses and charges for all courses offered by the West Coast University has been made and the following courses require a contract for the training of P.L. 346 veterans under the provisions of Change 4 to extract Manual M7-5.

*331
Branch of West Coast University Course

American School of Watchmaking- Master Craftsman Watchmaking
General Trades School — Branch Upholstering, Refrigeration
#1 & Radio Service Repair
General Trades School — Branch Tilesetting, Plastering.
#2
Your attention is invited to paragraph 106b (5) Change 4 to extract Manual M7-5, wherein it is stated that in any case in which a contract is required under VA regulations for the education and training of veterans, no payments whatsoever will be made to an institution until a written agreement or a contract between the Veterans Administration and the institution has been completed.[4]
11. During the period between July 30,1948, and November of 1948, the defendant notified plaintiff on a number of occasions that defendant would not recognize plaintiff as tax exempt under the lease arrangements. Meanwhile, plaintiff had not been paid for the courses material here because no formal contract had been signed between the parties. In November of 1948 Mr. O. D. McKenzie, vice president of Technical, notified the VA that the plaintiff was very anxious to work out some type of payment arrangement. The VA consented to pay plaintiff for instruction it had already given students in the months of July, August, and September 1948. Interim agreements were signed whereby rates to plaintiff would eventually be determined on a fair and reasonable formula, but, in the meantime, plaintiff would receive its claimed customary rates. A further provision was as follows:
4. It is further agreed that final payment of such services rendered shall not be made until such mutual agreement or formal contract has been reached and any payment or any portion thereof made under this memorandum agreement shall be subject to a refund to the Veterans Administration for the amounts by which any and all payments made to the institution exceed the amounts which are due under said mutual agreement or formal contract.
*332 Pursuant to such agreement, plaintiff received funds for instruction already given, in the months of July, August, and September 1948, and the VA was agreeable to this arrangement, for by this time plaintiff had provided instruction in October and part of November 1948, and if there was overpayment for July, August and September, the amount could be deducted from what was determined to be due plaintiff for the latter period.
Thereafter the interim agreements were extended, as set out in finding 17.
12. On February 21, 1949, as the result of a request for a ruling on whether plaintiff would be tax exempt on a purchase of the assets of the profit trade schools, the Bureau of Internal Revenue informed plaintiff:
Reference is made to the evidence submitted for use in determining the effect of certain new activities on your status for Federal income tax purposes.
In Bureau ruling dated November 4,1947, it was held that you are entitled to exemption from Federal income tax under the provisions of section 101(6) of the Internal Revenue Code and the corresponding provisions of prior revenue acts.
As of July 1, 1948, you entered into lease agreements with Technical Crafts Corporation and Hemphill Diesel and Automotive Schools, Inc., under which you agreed to continue to operate at their present locations the schools designated in the lease agreements using either the names under which they were at that time operated or those names in some conjunction with the name “West Coast University,” rentals under the leases being $21,-000.00 and $4,000.00 per month, respectively. Under the leases you took over the technical schools and courses formerly operated by the two schools in the State of California. The schools operated by Technical Crafts Corporation prior to the lease were the American School of Aircraft Instruments and Watchmaking; General Trades Schools; Plastics Industrial Technical Institute and Aero Industries Technical Institute. Since July 1, 1948, you have operated the schools under the leases.
You now propose to supersede these leases by an agreement with Technical Crafts Corporation, sometimes referred to in the agreement as Technical Crafts, the Hemphill Diesel and Automotive Schools, Inc., sometimes referred to in the agreement as Diesel, and Hemphill Schools, Inc. The agreement recites:
*333 “Whereas, it is the desire and intention of all of the parties hereto that this agreement be consummated in such a manner as to make it effective as of July 1,1948, and to place the parties in the position in which they would now find themselves had this agreement been executed and consummated on July 1,1948, and had the two leases executed as of July 1, 1948, from Technical Crafts and from Diesel to West Coast never been executed * *
* * * * *
It is the opinion of this office that if the agreement is executed and consummated without change in the provisions of the agreement or those of the supporting documents, your tax-exempt status as stated in Bureau ruling dated November 4, 1947, will not be affected thereby.
At the close of the year 1949 you should submit a detailed statement, in the form of an affidavit executed by one of your principal officers, showing your educational activities during the year 1949 as well as your activities in carrying out the agreement; a classified statement of your receipts and disbursements during the year; a complete statement of your assets and liabilities as of the close of the year and one copy each of the agreement, lease and each of the promissory notes with the signature, date and other blanks completed, in order that it may be determined whether you have actually operated in accordance with the provisions of section 101(6) of the Internal Revenue Code during that year.
The collector of internal revenue for your district is being advised of this action.
Mr. Dunlop, Chief of the Practices and Procedures Division of the Exempt Organizations Branch, Bureau of Internal Revenue, who did not write the letter of February 21, 1949, set out above, informed Mr. Monk, at VA, that the letter was an advisory opinion. The VA apparently concluded that a final ruling had not been made as to whether plaintiff was a tax-exempt institution.
13. Effective March 1, 1949, the VA issued a regulation designated as Change 9 to VA Manual M7-5, which redefined the meaning of nonprofit institutions and provided that only those nonprofit institutions which were institutions of higher learning could be considered as having a customary cost of tuition. Change 9 provided, in part:
*334 55. DEFINITION OF NONPROFIT INSTITUTION
[Except as hereinafter provided, an educational or training institution offering courses of vocational rehabilitation training under Public Law. 16, 78th Congress, as amended, or education and training under Public Law 346, 78th Congress, as amended, for the purpose of applying the governing statutes and applicable regulations of the veterans Administration respecting the payment of tuition and other charges, is regarded as a nonprofit institution if it is exempt from taxation under the following provisions of paragraph (6), section 101, of the Internal Revenue Code (52 Stat. 480, 26 U.S.C.A. §101(6)):]
“Corporations, and any community chest, fund, or foundation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation;”
[In addition to the foregoing, effective March 1, 1949, no educational or training institution will be regarded by the YA as a nonprofit institution if either of the following conditions prevails:
[a. The status as a nonprofit institution was first certified by the Bureau of Internal Revenue on a date subsequent to June 22, 1944, and the institution is not operated as a public tax-supported, or religious, or charitable corporation or agency or under the control of a public tax-supported, or religious, or charitable corporation or agency.
[b. The institution, or any part of an institution (any part refers to all courses provided at one time by a separate profit entity subsequently absorbed by a nonprofit institution), at any time subsequent to June 22, 1944, as operated or chartered for operation as a profit institution.]
55.1 DEFINITION OF “CUSTOMARY COST OF TUITION”
a. The term “Customary cost of tuition” as employed in paragraph 5, pant VIII, Veterans Regulation No. 1(a), as amended, for the purpose of administering the education and training program provided by said part VIII, is regarded as that charge which an educational or training institution requires a nonveteran enrollee similarly circumstanced to pay as and for tuition for a *335 course, except that the institution is not regarded as having a “customary cost of tuition” for the course or courses in question in the following circumstances:
(1) Where the majority of the enrollment of the educational and training institution in the course in question consists of veterans in training under Public Laws 16 and 346,78th Congress, as amended, and,
(21 One of the following conditions prevails:
(a) The institution has been established subsequent to June 22,1944.
(b) The institution although established prior to June 22, 1944, has not been in continuous operation since that date.
(c) The institution although established prior to June 22,1944, has subsequently increased its total tuition charges for the course to all students more than 25 percent.
(d) The course was not provided for nonveteran students by the institution prior to June 22,1944, although the institution itself was established before June 22, 1944.
b. Educational institutions of higher learning which are nonprofit institutions as defined in paragraph 55, shall not be subject to the provisions of subparagraph a above.
c. Except for institutions of higher learning as provided in subparagraph b above, the payment by the Veterans .Administration of the customary cost of tuition or fair and reasonable compensation, whichever is applicable, shall only be made under the provisions of paragraph 92.
14. Subsequently, on March 30, 1949, but purportedly effective June 1, 1948, a new agreement was entered into between plaintiff and the two profit schools controlled by the chairman of plaintiff’s board of trustees. This agreement cancelled the lease arrangement made July 30, 1948, which never actually became effective. It was superseded by an agreement of sale to plaintiff of the assets involved in the proposed lease arrangement. This sales agreement was also conditioned on plaintiff’s receiving a ruling from the Bureau of Internal Revenue that, after this change in organization and method of operation, it would be a nonprofit institution. Such ruling was made under date of January 8,1951, which reaffirmed similar rulings which had been made November 4,1947, and February 21,1949.
*336 15. As then, constituted, after the agreement of sale dated March 30, 1949, the plaintiff corporation was composed of seven trade schools having an enrollment of about 1,282 students and a college of engineering having an enrollment of about 136 students. Of these 1,418 enrolled, all but 50 were veterans. For the year commencing July 1, 1948, the total tuition of the plaintiff corporation amounted to $2,140,460.35, of which the college of engineering accounted for $85,904.73.
16. On March 4, 1949, plaintiff applied to the VA to have the school considered a nonprofit institution from July 1, 1948, the date of Change 4, on the basis of Bureau of Internal Revenue letter of February 21, 1949. The VA replied, setting out its position in a letter of May 12,1949, which stated:
Receipt is acknowledged of your letter of April 19, 1949,[5] stating that since the Bureau of Internal Revenue originally recognized the West Coast University as a non-profit institution, as of November 4, 1947, and reaffirmed such recognition February 21, 1949, after the acquisition of additional facilities, that the University should be considered as a non-profit institution as of November 4, 1947, and therefore not subject to the provisions of Change 4 of Veterans Administration Manual M7-5, and exempt from a contract and a fair and reasonable cost determination.
It appears that on the basis of a lease agreement, effective as of July 1, 1948, entered into between the Technical Crafts Corporation, Hemphill Diesel and Automotive Schools and West Coast University, application was made to the Bureau of Internal Revenue by West Coast University for recognition as entitled to exemption from Federal Income Tax under the provisions of the Internal Revenue Code. Such recognition was not granted on the basis of the lease agreement. Thereafter, a further application was made for exemption, this time under an agreement with Technical Crafts Corporation, Hemphill Diesel and Automotive Schools, Inc., and Hemphill Schools, Inc., to purchase certain assets rather than lease them.
On February 21, 1949, based on the purchase agreement as distinguished from the lease agreement, the Bureau of Internal Revenue recognized West Coast Uni *337 versity as now organized as exempt from taxation provided certain conditions were met.
Under regulations of tire Veterans Administration which became effective July 1, 1948, profit institutions established subsequent to June 22, 1944, or which have increased their rates subsequent to that date in what appears to be an unreasonable amount for services rendered, are required to submit cost data and enter into a contract to provide payment to the institution of a fair and reasonable rate. West Coast University was advised of the regulation and has only recently submitted such cost data which is now being analyzed by the Los Angeles Legion al Office.
Since, on the effective date of the regulation, July 1, 1948, the Divisions of West Coast University acquired from Technical Crafts Corporation, etc., were not recognized as tax exempt institutions for purposes of payment by the Veterans Administration, they must be considered as profit institutions and subject to the regulations affecting such schools, thereby requiring the submission of cost data and a contract from July 1, 1948.
It is understood that the contract will include an escape clause providing that in the event the regulation of the Veterans Administration is judicially determined to be invalid the institution will be entitled to receive its claimed customary charges in effect as of July 1, 1948. It is further understood that the Los Angeles Regional Office has been authorized to approve a short term contract at rates determined to be fair and reasonable in order to expedite action on your contract and relieve the financial strain on your institution.
17. On or about May 27, 1949, following prolonged negotiations, the interim agreements originally concluded in November 1948 were extended to February 28,1949. By that time plaintiff had filed a cost-data statement for the period July 1,1947, to July 1,1948, pursuant to Change 4. It was determined that the VA would continue payments to the plaintiff at the rates stated in the interim agreements amounting to about $500,000 (at the school’s customary rate), less an amount sufficient to cover the difference between the claimed customary rates and those rates to which it was expected plaintiff would eventually be entitled under Change 4 on a fair and reasonable basis. Accordingly, the VA withheld approximately $80,000, pending a final determination of the rights of plaintiff.
*338 It was also agreed that plaintiff would enter into contracts, effective March 1, 1949, under Change 9, and that the rates in these contracts would be determined upon the submission of certain additional cost data within two months. In the interim the payments were to be made on cost data already received, without prejudice to an upward or downward adjustment of these rates based on the additional cost data. The pertinent provision reads:
4. It is further agreed between the Contractor and the Veterans Administration that a subsequent contract which will supersede this contract, embodying rates determined to be fair and reasonable by the Veterans Administration or the claimed customary rates charged by the Contractor, whichever is the lesser, shall be negotiated as soon as these rates can be determined in accordance with the provisions contained in paragraph 80 of VA Manual M7-5 as amended by Changes 1 through 9.
18. The following letter was sent to Mr. Monk of the VA by plaintiff’s attorney on May 25,1950:
On behalf of West Coast University, Los Angeles, California, I regret to advise you that the Veterans Administration tuition rates presently in effect and in future prospect will require the early termination of the veterans’ program in the following courses, involving an aggregate or more than 1,200 veterans:
Engineering-
Watchmaking
Upholstering
Refrigeration, Appliances and Radio
Diesel Mechanics
Plastering
Tilesetting
For many months, the University has cooperated with the Veterans Administration and endeavored to give efficient training to veteran students. It has built a capable corps of instructors and offered courses of instruction which compare favorably with those offered elsewhere. However, there have been many difficulties. The University received a letter from the Bureau of Internal Revenue that it is classed as a tax exempt institution. The Veterans Administration has refused to accept this ruling and as a consequence has withheld a sum of $80,000 due the University for services rendered for the period July 1,1948, to February 28,1949.
For the period subsequent to March 1, 1949, the Vet *339 erans Administration has required the University to prepare at great expense and submit cost figures which will form the basis for determining tuition rates on said courses. The first cost figures based on the experience of West Coast University were submitted to the Veterans Administration approximately six months ago but the Veterans Administration has not yet been able to complete its study and fix tuition rates. In the meantime, the University has been cooperating under extensions of its original contracts. The period covered by these extensions has now expired and the Veterans Administration will not further extend them unless the University accepts a 25% reduction in rates.
While the University is willing to accept the old rates for an additional period, the reductions in rates now proposed by the Veterans Administration would result in actual operating losses and are therefore unacceptable to the University. The situation was fully explained 'by Messrs. Roy and Ralph Hemphill at a conference with your office in Washington on May 24, but they were advised that the Veterans Administration would not alter its position and would insist upon a 25% reduction in rates. In addition, the Messrs. Hemp-hill were informed that if the Veterans Administration ultimately accepts the ruling of the Bureau of Internal Revenue with respect to the tax exempt status of the University, the Veterans Administration will then fix new retroactive rates which will require the University to make refunds to the Veterans Administration, resulting in further losses.
Accordingly, the situation today is that the Veterans Administration is offering tuition rates which will currently result in operating losses and in addition, is announcing that it has in mind retroactive reductions in rates which will produce further losses. Under the circumstances, the University is faced with the alternatives (1) of continuing its present operations with the practical certainty that it will not even be reimbursed for its actual costs of operations; or (2) of terminating its veterans training in the above courses.
The financial position of the University will not permit it to absorb the losses in prospect and it has accordingly authorized me to advise you that on June 1, 1950, it proposes to give notice to its teaching staff, other employees and students that veterans’ training in the said courses will terminate on June 15, 1950, unless in the meantime, satisfactory tuition rates are offered by the Veterans Administration, and the University, is assured *340 that there will be no retroactive reduction in tuition, which the University has already fully earned.
The University regrets the necessity for this action because it realizes the hardship which will be imposed upon veteran students and upon its faithful corps of instructors and other employees. While the University feels that it must take the proposed action in order to protect itself against crippling losses, it is hoped that the Veterans Administration will be able to make satisfactory arrangements so that the veterans can continue their studies and training.
It thus appears that counsel for plaintiff contended that the school was entitled to a customary cost of tuition. Mr. Monk took the position that with respect to the period July 1, 1948, to February 28, 1949, governed by Change 4, there had been no “final” determination as to the nonprofit status of West Coast University by the Internal Revenue Service. Actually, there had been a determination with respect to the nonprofit status of West Coast which was still in effect (see footnote to finding 10). In any event, Mr. Monk insisted that for the period beginning March 1, 1949 (the effective date of Change 9), West Coast University could not qualify for a customary rate since the trade school courses were not given by a nonprofit institution prior to June 22,1944, as required by Change 9 (55b).
There were three periods to be considered: (1) July 1,1948, to February 28, 1949, under Change 4; (2) March 1, 1949, to February 28, 1950, under Change 9; and (3) March 1, 1950, to February 28,1951. If the school was not entitled to a customary rate and formal contracts were required, the rate would be determined on the basis of the school’s cost data for an acceptable preceding period. Under the provisions of Public Law 266, 81st Congress, the rate established in the second of two successive contracts would become the customary cost of tuition (the so-called “frozen rate”) for all subsequent contracts relating to the same or similar courses of instruction. The provision (63 Stat. 631, 653) is quoted as follows:
* * * Provided further, That no part of this appropriation for education and training * * * shall be expended subsequent to the effective date of this Act for sub *341 sistence allowance or for tuition, fees, or other charges in any of the following situations:
‡ ‡ ‡
(2) For any course of education or training for which the educational or training institution involved has no customary cost of tuition, until a fair and reasonable rate of payment for tuition, fees, or other charges for such course has been determined. In any case in which one or more contracts providing a rate or rates of tuition have been executed for two successive years, the rate established by the most recent contract shall be considered to be the customary cost of tuition notwithstanding the definition of “customary cost of tuition” as hereinafter set forth. If the Administrator finds that any institution has no customary cost of tuition he shall forthwith fix and pay or cause to be paid a fair and reasonable rate of payment for tuition, fees, and other charges for the courses offered by such institution. Any educational or training institution which is dissatisfied with a determination of a rate of payment for tuition, fees, or other charges under the foregoing provisions of this paragraph shall be entitled, upon application therefor, to a review of such determination (including the determination with respect to whether there is a customary cost of tuition) by a board to be known as the “Veterans’ Tuition Appeals Board” consisting of three members, appointed by the Administrator for such purpose. Such board shall be subject, in respect to appointment, hearings, appeals, and all other actions and qualifications, to the provisions of sections 5 to 11, inclusive, of the Administrative Procedure Act, approved June 11, 1946, as amended. * * *
19. Counsel for plaintiff informed Mr. Monk that the school would like to have the rate embodied in the contract for the period March 1, 1949, to February 28, 1950, frozen for all subsequent contracts. Such an arrangement would be possible only if West Coast University was treated as a profit school and the rate contained in the second of a series of two successive contracts was based on cost data. If West Coast University was entitled to a customary cost of tuition for the previous period (July 1,1948, to February 28,1949) as a nonprofit school, there would be only one contract (involving the period March 1, 1949, to February 28, 1950) which could be utilized and accordingly the prior rate would *342 not become the frozen rate. Mr. Monk thought there was a binding understanding or agreement by the parties as follows:
(1) West Coast University would waive any claim to be treated as a nonprofit institution; it would be treated as profit school and would execute a formal contract for a fair and reasonable rate for the period beginning July 1, 1948, based on cost data for the preceding year (July 1, 1947, to June 30, 1948).
(2) The period of this contract, instead of running from July 1, 1948, to February 28, 1949, would be extended to June 30, 1949. This would give the school a higher rate for the last four months than it would have received if the contract ran for the shorter period. The reason is that a contract beginning March 1, 1949, would have to be based on new cost data for the period immediately preceding that date, and it appeared that this latter cost data would call for a lower rate than the cost data which was being used for the first contract.
(3) A formal contract would be executed on fair and reasonable rates for the period July 1,1949, to June 30,1950, based on cost data for the period July 1, 1948, to February 28, 1949.
(4)' In computing the rate the school would be granted the standard formula for profit.
(5)' The school would refund to the Veterans Administration for the period July 1, 1948, to February 28, 1949, the difference between the payments made to the school at the customary rate and the fair and reasonable rate specified in the formal contract. This was in accordance with the provisions of the interim agreements.
(6) In view of the fact that the VA had yet to determine a tuition rate based on cost data, the contract would contain a provision that the school could appeal to the Veterans’ Tuition Appeals Board concerning the fairness and reasonableness of the rate but not with respect to the question of entitlement to a customary cost of tuition. A change was made in the standard appeals clause which had been adopted by the VA. The standard clause read as follows:
*343 The execution of this contract shall be without prejudice to [name of institution] appeal to the Veterans’ Tuition Appeals Board the question of existence of customary-costs or of fair and reasonable rates, and the contract shall be subject to any revision made by said Board pursuant to the governing statutes and regulations.
It was proposed to substitute the following appeals clause which was incorporated in the contracts:
This contract shall be without prejudice to the rights of the institution, if any, to appeal the determination of the fair and reasonable rates contained herein.
It is plaintiff’s position that no binding agreement was made and that the documentary proof supports such a conclusion.
20. On June 16, 1950, the following communication was sent from the 'Central Office of the VA in Washington, D.C., to the VA Regional Office in Los Angeles, California:
1. Reference is made to your telephone conversation on June 14,1950 with the Director, Training Facilities Service, concerning the negotiation of contracts with the subject institution.
2. In the telephone conversation between you and the Director, Training Facilities Service, it was agreed that you would proceed with negotiations with West Coast University for courses provided by the University through the College of Engineering, General Trades School No. 1, General Trade School No. 2, the Hemphill Diesel and Automotive Schools and the American School of Watchmaking in accordance with the following:
a. The rates to be paid to the West Coast University for the period July 1, 1948 through June 30, 1949 will be those rates which were established by your office as fair and reasonable for the period July 1, 1948 to February 28,1949 on the basis of cost data submitted for the operation of the Technical Crafts Corporation and in addition will include rates for the Engineering courses in the College of Engineering at the claimed customary charge of the institution of $120 for an 8 weeks term which will be the total payment to West Coast University for the Engineering courses. The registration fees are not to be paid in addition to the $120 total charge. According to our records, the rates previously agreed to be fair and reasonable for the period July 1,1948 to
*344 February 28, 1949, exclusive of the rates for the College of Engineering, are as follows:

Bate per

Name of course cloeh hour

Diesel Engine Mechanics_0. 588
Electrical Appliances, Refrigeration and Radio Service
and Repair_ . 525
Upholstering_ . 588
Plastering_ . 478
Tilesetting_ . 472
Watchmaking_ . 324
b. The rates for the period July 1, 1949 to June 30, 1950 will be those rates which were determined to be fair and reasonable by the 'Special Assistant to the Director, Training Facilities Service, Denver, Colorado, in conjunction with your office on the basis of the last cost data submitted by West Coast University, provided that if it is decided by the institution that the courses in Plastering and Watchmaking are to be discontinued effective June 15, 1950, insofar as any new enrollments of veterans are concerned, the rate for these courses to cover the completion of the training of the veterans currently enrolled as of June 15, 1950 will be the claimed customary rates of the institution of $.589 per hour for Plastering and $.429 per hour for Watchmaking. These latter rates will be payable for the period June 16,1950 to the date the veterans then enrolled either complete their courses or discontinue their training. The. contract for these two courses, if the institution desires to discontinue further enrollments, must clearly specify that the rates cover only those veterans currently enrolled as of June 15 and that no new veterans are to be enrolled in these courses in the future. The VA will not agree to the enrollment of veterans in those courses in the future on a limited scale on the theory that the majority of the enrollment in the courses may at that time be non-veteran students and that the institution is entitled to payment of its claimed customary charges for a limited number of veterans. In other words, if West 'Coast University now desires to arrange to complete the present veterans at their claimed customary charges, it means the end of veteran training in West Coast University in the Plastering and Watchmaking courses. It is understood that the rates finally offered to West Coast University by the Special Assistant, Training Facilities Service, Denver, Colorado, and concurred in by your office are as follows:

*345
Name of course Rate per eloch hour

Diesel Engine Mechanics_ $0.456
Electrical Appliance, Refrigeration and Radio Service
and Repair_ .488
Upholstering_ .506
Plastering_ .360
Tilesetting_ .420
Engineering ($120 per term)_ .600
Watchmaking_ .337
c. The rates established by the contract for the period July 1, 1949 to June 30, 1950 under the provisions of Public Law 266,81st Congress, and Instruction 1, Public Law 266, will establish as of July 1,1950 the customary cost of tuition for this Institution and unless there are further changes in the law which would require a different action, the institution will not be required to submit further cost data so long as the courses remain the same as those contained in the contract for the period July 1, 1949 to June 30,1950.
d. The net amount due the VA because of overpay-ments which have been made during the period July 1, 1948 to May 31,1950 will be repaid to the VA under an arrangement to be worked out between your office and the officials of West Coast University. In your telephone conversation with the Director, Training Facilities Service, you indicated that an arrangement had been agreed upon between you and the officials of West Coast University to liquidate this overpayment in six equal installments beginning with the month of June 1950.
e. West Coast University through their attorney, Mr. Monarch, here in Washington has stated to the VA that the institution is dropping its claim for non-profit status, effective as of July 1, 1948 and is requesting the VA to pay the institution as a profit institution from that date on. Under this arrangement the institution is rescinding its previous claim that it is entitled to the payment of its claimed customary charges for the period July 1, 1948 to March 1,1949.
f. Under the contracts and memorandum agreements which have been in effect between the VA and West Coast University for the period July 1,1948 to March 1, 1949, the institution had not reserved unto itself the right of appeal and, although the question has not been determined finally, it is not believed that the institution does have a right of appeal for that period. However, if the institution now requests that a clause be inserted in the contracts, it has been agreed with the attorney, Mr. Monarch, that the following clause may be inserted in *346 tbe contracts in lien of the appeal clause contained in paragraph 4d of Instruction 1, Public Law 266, 81st Congress:
“This contract shall be without prejudice to the rights of the institution, if any, to appeal the determination of the fair and reasonable rate contained herein.”
3. In order to complete negotiations and to accomplish the aforementioned agreements it will be necessary for new contracts to be drawn for the periods July 1, 1948 to June 30,1949 and July 1, 1949 to June 30, 1950 which will cancel and supersede the memorandum agreements and contracts which have heretofore been in effect for those periods.
21. (1) On June 16,1950, plaintiff sent the following letter to the YA:
The Veterans Administration and the West Coast University have now agreed upon a settlement of their differences, and a contract is being prepared which will treat the University as a profit school within the meaning of the Veterans Administration regulations. The University believes that under a proper interpretation of the law it is entitled to be recognized as a non-profit school and you are hereby notified that it is accepting classification as a profit school for settlement purposes only.
(2) Under date of June 23, 1950, Mr. Mont wrote a reply to the letter of June 16 relating to the nonprofit status of plaintiff school and seeking a confirmation of Monk’s understanding that plaintiff would “waive its nonprofit status for all purposes.”
(3) On July 6, 1950, plaintiff advised the VA by letter that it was signing the contract with the understanding that the West Coast University would not forfeit any of its rights to appeal. It would appear that any misunderstanding which existed at that time should have been resolved before the contracts were signed.
22. The record does not support a finding that plaintiff waived its claim to a customary cost of tuition for all purposes. On June 14, 1950, plaintiff was in no position to bargain for a contract; it made the best terms it could obtain but reserved the right to appeal. The letters referred to in finding 21 were written before the VA signed the contracts, *347 and it was accordingly on notice that plaintiff continued to claim its tax exempt and nonprofit status.
23. In the Board proceedings under Docket 115, the VA made no statement that plaintiff had waived its claim to a nonprofit status. The VA conceded that the engineering school was a nonprofit institution and was entitled to its customary cost of tuition and further that plaintiff in its entirety was a nonprofit institution, although not an institution of higher learning.
24. Plaintiff received contracts on a fair and reasonable basis to which it was entitled as a profit school. Only one fair and reasonable rate determination was made by the VA. It was made by Mr. Monk, who had a choice between two recommendations from his subordinates. Plaintiff did not make the choice. The claimed waiver was not referred to until defendant’s First Amended Answer was filed on November 16, 1956.
25. Mr. Monk has not stated that the contract rates were excessive. He insists, however, that he would have made a determination of lower rates which would have been fair and reasonable. The VA could have substituted lower rates after receipt of the letters referred to in finding 21. The contract rates were subject to review and were reduced by the Board. The defendant’s counterclaim now seeks to recover the difference between the contract rates and those prescribed by the Board.
26. The rates fixed by the VA as fair and reasonable were not sufficient to cover plaintiff’s actual cost of operation. Consequently, plaintiff operated with annual deficits. Plaintiff’s costs of operation are shown by the cost analysis. It is conceded by defendant that the costs claimed had been spent for the purposes indicated and there has been no allegation of fraud.
27. Mr. Monk explained that the delay in making contracts with plaintiff was due to the fact that the VA concluded that the school’s tax-exempt status had not been finally determined. A ruling had been made November 4,1947, granting tax exemption. It was never withdrawn or changed. There is no such thing as a “final” determination in the sense that there is no possibility of change. The Internal Revenue *348 Service exercises a continuing scrutiny over tax-exempt institutions, and may at any time withdraw the certificate of exemption. There is no tax-exempt institution whose status is not subject to change, if circumstances warrant such action.
28. When the VA was required to determine plaintiff’s status on March 1, 1948, it was incumbent upon VA to respect the tax-exempt certificate which was outstanding at the time or take appropriate steps to have it suspended, modified, or revoked. As of March 1,1948, the Internal Eevenue Service was not reviewing its decision. Both the initial decision and the final decision of the Veterans’ Education Appeals Board held that the failure by the VA to give effect to the tax-exempt ruling of the Internal Eevenue Service ivas arbitrary. The decision is supported by substantial evidence.
29. As of March 1,1948, contracts could have been drawn containing a provision for revision of the rates in the event of a later change in the tax-exempt status. The withholding of all payments appears to have been unreasonable when the facts and existing circumstances are analyzed.
30. The tax ruling of February SI, 1949, appears to have been a definitive approval of the continuing tax-exempt status of the plaintiff. The ruling was predicated upon the proposed transaction with Technical, and the fact that plaintiff was required later to report the consummation of the proposed transaction did not suspend its tax-exempt status in the meantime nor furnish adequate reason for the VA to further delay negotiating contracts with plaintiff. The Internal Eevenue Service did not withhold its approval until the proposed transaction was completed.
31. The United States Office of Education has published statistics showing that the offering of nonprofessional courses by institutions of higher learning was widespread. Such courses were offered by 660 institutions of higher education, more than one-third of those in the United States. The total enrollment of such students was 144,512. One of the oldest and largest junior colleges in the country, located in California, had reported a total enrollment of 9,247 students in 1948, of whom 5,343 were enrolled in technical courses. Thirty-one higher educational institutions reported 17,682 students enrolled in craftsman-clerical courses. Most of these figures are for the year 1956.
*349 32. The reason for limiting customary rates to institutions of higher learning was predicated on the assumption that the management of such institutions could be relied on to charge reasonable rates. Nearly one-third of such institutions also offered nonprofessional courses and the classification of institution of higher learning was granted by statute to all of them.
33. It is not unusual for higher educational schools to offer courses below the college level. The Hearing Examiner referred to the Laboratory School of the University of Chicago as a good example, since it ranges from kindergarten through high school. The record also shows that Purdue University, at Lafayette, Indiana, has 60 technical schools located in the State of Indiana and the total enrollment far exceeds the enrollment at the University.
34. Prior to July 1, 1948, plaintiff was exclusively an engineering school, and the Board found that it was a high-ranking educational institution. After the completion of the “GI” program, plaintiff operated only the engineering school. An institution of higher learning is a school which offers courses above the high school level. Plaintiff continuously satisfied that requirement, even after the addition of courses below college level. The Board’s findings that this case involves a nonprofit institution as well as an institution of higher learning supports a finding that plaintiff is entitled to its customary cost of tuition.
35. On July 6, 1950, the following contracts, containing the rates indicated, were signed by the parties:
(1) Contract No. V3044V-6Y3, for the period July 1,1948, through June 30, 1949:
In General Trade Schools, Branch No. 1:
Electrical Applicances, Refrigeration, Radio Service
and Repair_$420. 00
Upholstering_ 352. 80
In school of Watchmaking:
Master Craftsman Watchmaking_ 623. 00
(2) Contract No. V3044V-674, for the period July 1,1948, through June 30,1949:
In the Hemphill Diesel and Antomotive Schools:
Diesel Engine Mechanics_$499. 80
In General Trade Schools, Branch No. 2:
Plastering_ 239.00
Tilesetting _ 236.00
*350 (3) Contract No. V3044V-675, for tbe period July 1,1949, through June 30,1950:
In the Hemphill Diesel and Automotive Schools:
Diesel Engine Mechanics_$397. 80
In General Trade Schools, Branch No. 2:
Plastering_ 180.50
Tilesetting _ 209.50
(4) Contract No. V3044V-678, for the period July 1,1949, through June 30,1950:
In General Trade Schools, Branch No. 1:
Electrical Applicanees, Refrigeration, Radio Serv-
ice and Repair_$393.60
Upholstering_ 306.00
In school of Watchmaking:
Master Craftsman Watchmaking:
July 1,1949 to June 15,1950_ 648.96
June 16,1949, to June 30, 1950_ 825. 00
36. These four contracts specifically provided, in Schedule I, in part as follows:
4. It is understood and agreed between the Contractor and the Veterans Administration that final payments for services rendered in the above courses for the period of this Contract snail be computed in accordance with the above tuition rates and that the net refmid due the Veterans Administration from the Contractor under the contract shall be determined and made in the form and manner prescribed by the Finance Division of the Veterans Administration, Los Angeles Regional Office.
They further contained the appeals clause agreed to by the parties, as follows:
5. This contract shall be without prejudice to the rights of the institution, if any, to appeal the determination of the fair and reasonable rates contained herein.
37. Thereafter, on July 24, 1950, the parties entered into contract V3044V-690, for the period July 1, 1950, through June 30,1951; and on July 19,1951, the parties entered into contract V3044V-910, for the period July 1, 1951, through June 30,1952. Both these contracts covered courses in diesel engine mechanics, plastering, tilesetting, electrical appliances, refrigeration, and radio service and repair, upholstering, and master craftsman watchmaking. The rates in these contracts were the same as those set for the period July 1, 1949, through June 30, 1950, in contracts V3044V-675 and V3044V-678.
*351 38. On January 8, 1951, the Bureau of Internal Revenue made the following determination with respect to plaintiff’s exemption from Federal income tax, specifically affirming the prior ruling of November 4,1947:
It is the opinion of this office, 'based upon the evidence presented, that you are exempt from Federal income tax under the provisions of section 101(6) of the Internal Revenue Code and corresponding provisions of prior revenue acts, as it is shown that you are organized and operated exclusively for educational purposes.
Accordingly, you will not be required to file income tax returns unless you change the character of your organization, the purposes for which you were organized, or your method of operation. Any such changes should be reported immediately to the collector of internal revenue for your district in order that their effect upon your exempt status may be determined.
Contributions made to you are deductible by the donors in computing their taxable net income in the manner and to the extent provided by section 23 (o) and (q) of the Internal Revenue Code, as amended, and corresponding provisions of prior revenue acts.
Bequests, legacies, devises or transfers, to or for your use are deductible in computing the value of the net estate of a decedent for estate tax purposes in the manner and to the extent provided by sections 812(d) and 861 (a) (3) of the Code and/or corresponding provisions of prior revenue acts. Gifts of property to you are deductible in computing net gifts for gift tax purposes in the manner and to the extent provided in section 1004(a) (2) (B) and 1004(b) (2) and (3) of the Code and/or corresponding provisions of prior revenue acts.
It will not be necessary for you to file the annual return of information, Form 990A, generally required of organizations exempt under section 101 of the Internal Revenue Code, as you come within the specific exceptions contained in section 54(f) of the Code.
In the event you have not filed a waiver of exemption certificate in accordance with the provisions of section 1426(1) of the Code, no liability is incurred by your organization for the taxes imposed under the Federal Insurance Contributions Act. Tax liability is not incurred by your organization under the Federal Unemployment Tax Act by virtue of the provisions of section 1607(c) (8) of such Act.
Bureau ruling dated November 4, 1947, holding you exempt from Federal income tax under the provisions *352 of section 101(6) of the Internal Revenue Code and corresponding provisions of prior revenue acts, is hereby affirmed.
The collector of internal revenue for your district is being advised of this action.
By direction of the Commissioner.
This was the third notice of a determination by the Bureau of Internal Revenue with reference to plaintiff’s exemption from Federal income taxes, and such determination specifically affirmed the prior determination made November 4, 194Y. A ruling was obtained from the Bureau dated February 21, 1949, with respect to the effect on plaintiff’s tax-exempt status of the purchase of the profit trade schools (finding 12).
39. On December 8,1950, plaintiff filed an application for review of the tuition rates set in contracts V3044V-673, V3044V-674, V3044V-675, and V3044V-678 with the Veterans’ Education Appeals Board, under Public Law 610,81st Cong., 2d Sess., 64 Stat. 336, 339, which provides, in part:
* * * If the Administrator finds that any institution has no customary cost of tuition he shall forthwith fix and pay or cause to be paid a fair and reasonable rate of payment for tuition, fees, and other charges for the courses offered by such institution. Any educational or training institution which is dissatisfied with a determination of a rate of payment for tuition, fees, or other charges under the foregoing provisions of this paragraph, or with any other action of the Administrator under the amendments made by the Veterans’ Education and Training Amendments of 1950, shall be entitled, uj)on application therefor, to a review of such determination or action (including the determination with respect to whether there is a customary cost of tuition) by a board to be known as the “Veterans’ Education Appeals Board” consisting of three members, appointed by the President. * * *
40. The Board docketed plaintiff’s appeal as No. 115, and a hearing was held by the Board. The record of the hearing includes 1,204 pages of transcript and 65 exhibits. The lengthy decision and opinion of the Board, dated December 14, 1950, deals with all the issues presented.
41. In its decision the Board made several determinations which it summarized as follows:
*353 1. Applicant’s College of Engineering was a nonprofit institution of higher learning during the period July 1, 1949, to June 30,1950, and as to its College of Engineering courses furnished under Contract Y3044Y-679, it was entitled to payment of customary costs, i.e., the charge which the institution required nonveteran en-rollees similarly circumstanced to pay as and for tuition for such courses (subject of course to the legal limitation in the event a veteran does not elect to accelerate his entitlement).
2. Although nonprofit, applicant was not an institution of higher learning as to its trade courses during the period July 1,1949, to June 30,1950.
3. Contracts Y3044Y-675 and Y3044Y-678, for the aforesaid period, must be revised to provide the following rates for the courses: Plastering, $200 for the course of 500 hours; Tilesetting, $208.50 for the course of 500 hours; Diesel Engine Mechanics, $404.60 for the course of 850 hours; Master Craftsman Watchmaking, $627.84 for the course of 1,920 hours; Electrical Appliances, Eefrigeration, and Eadio Service and Eepair, $381.60 for the course of 800 hours; and Upholstery, $301.20 for the course of 600 hours.
4. The Application be and it hereby is dismissed for lack of jurisdiction as to Contracts Y3044Y-673 and Y3044Y-674. * * *[6]
The Board also held that Change 9 was a valid regulation within the regulatory authority of the YA. In this connection the Board said:
Changes 4 and 9 were promulgated under the rule-making power vested in the Administrator under paragraph 9 of part YIII providing: “Consistent with and subject to the provisions and limitations set forth in this title, the Administrator shall, from time to time, prescribe and promulgate such rules and regulations as may be necessary to carry out its purposes and provisions.”
In discussing the subject of whether the trade courses could come within the category of institutions of higher learning, the Board had the following to say: “* * * West Coast was an institution of higher learning only in respect *354 of tbe College of Engineering.” Tbe Board’s comment is quoted further as follows:

Trade Courses

Does tbe academic status of tbe College of Engineering carry the trade school courses along with it so they too may travel under tbe banner of an institution of higher learning? We examined tbe question in tbe Milwaukee case, supra, where we said: “It is common among other institutions of higher learning, whose standing as such cannot be questioned, to offer some courses generally considered to be below college level. The extent to which such practice exists in a particular institution must necessarily be greatly persuasive towards a decision regarding its privilege of exemption from the safeguards imposed by the law and regulations, which by exclusive utterance delimits those who shall and those who shall not be subject to its regulatory provisions. The phrase ‘institution of higher learning,’ it is thus concluded, is not a technical phrase, and its meaning as applied to the particular case resolves itself into one of degree when set to the pattern of generally accepted guides. Between the two extremes of those who aye and those who are not, are innumerable variations that bring the particular institution closer to one pole or the other of the range of exemption and inclusion. A determination of which side of the median line the particular school belongs calls for studied judgment of the essential characteristics and an examination of the individual factual situation.”
From the viewpoint of students numbers, the question would, of course, have to be resolved against the applicant. For example, for the first year of combined operation, ending June 30? 1949, there was an average of only about 100 engineering students, as we have seen, while the enrollment in the trade schools was about 2,000. Likewise, the total tuition income of the school amounted to $2,140,460.35, of which the College of Engineering accounted for only $85,904.73. Aside from the assumption of the title “West Coast University,” the complexion derives from the heavy concentration on the trade courses rather than from the engineering courses which formed such an insignificant part of the curriculum. Had the disappearing identity been “West Coast University” and the continuance of “Technical Crafts, Inc.,” we think there would be little room for the contention that the trade school operation became that of an institution of higher learning. Yet, in principle and substance the *355 result should be the same regardless of which school survived. The engineering courses are not sequential to the trade courses in the West Coast curriculum. For this reason the Hearing Examiner applied dictum appearing in the Milwaukee case, supra, to arrive at his conclusion that only with respect to the engineering courses was the institution to be regarded as. an institution of higher learning. Considering the history of the schools, the discreteness of their contemporaneous functioning and the survival of the engineering school with the closing of the trade school, we conclude that the dictum in question was properly applied and that West Coast was an institution of higher learning only on respect of the College of Engineering. [Footnotes omitted.]
With respect to the trade school courses, West Coast had no customary cost of tuition and, therefore, the YA was required to fix fair and reasonable rates based on cost data under Change 9. In this connection the Board said:

Test of Customary Cost for Trade Courses

It remains to be decided whether in its trade school applicant was entitled to customary charges provided in the regulations for schools meeting certain historical tests. Paragraph 55.1 of change 9 to VA Manual M7-5 provides that an institution is not regarded as having a “customary cost of tuition” for a course or courses where the majority of the enrollment in said course or courses consists of veterans and one of four stated conditions prevails. The conditions germane to the courses under consideration are as follows:
“(c) The institution although established prior to June 22,1944, has subsequently increased its total tuition charges for the course to all students more than 25 percent.
“ (d) The course was not provided for nonveteran students by the institution prior to June 22,1944, although the institution itself was established before June 22, 1944.”
As to veteran majorities, the evidence shows that there was a majority of veterans enrolled in all of the courses here under review at all times subsequent to June 22, 1944. Respecting four of the courses, the second condition cited is a bar to customary cost, since these courses, namely, Tilesetting, Plastering, Upholstering, and Electrical Appliances, were not offered prior to June 22,1944. The remaining courses, Diesel Engine Mechanics and Master Craftsman Watchmaking, fall afoul of the tui *356 tion increase provision, even considering the courses given before and after June 22 as the same. The Diesel Engine Mechanics course was originally offered by the Hemphill Diesel and Automotive School on February 1, 1939, as a 4-month course at a tuition cost of $325. On September 15, 1947, it was increased in length to 34 weeks, and the tuition raised to $499.80. Prior to June 22, 1944, the Master Craftsman Watchmaking course was offered 'by Technical Crafts doing business as American School of Watchmaking. It was a 12-month course at a total tuition charge of $515. Effective July 1, 1946, the length of the course was increased to 64 weeks with a total charge of $825. From the aspect of length, the courses given before and after June 22, 1944, in Watchmaking and Diesel Engines were not the same. (See Cambridge School of Radio Broadcasting, Inc. v. Administrator, Docket No. 91, June 17, 1953; Hal Styles School of Radio v. Administrator, Docket No. 238, October 30,1953.) Thus these courses would fail of customary cost on two counts. We turn, therefore, to the determination of fair and reasonable rates for the trade courses.
The Board reviewed the rates fixed by the VA in contracts V3044V-675 and V3044V-678. Plaintiff offered no evidence during the trial with respect to adjustments made by the Board. In its requested findings of fact, however, plaintiff has objected to the Board’s adjustments in two items of cost, namely, administrative expense and interest. An objection has also been made concerning the reduction of the profit allowance from 10 percent to 6 percent. Those three items are analyzed and discussed in the remaining paragraphs of this finding.
(a) In computing plaintiff’s administrative expense, the Board accepted all of plaintiff’s cost figures except those for administrative salaries and interest. It allowed 70 percent of plaintiff’s administrative expenses as administrative salaries. In making that determination the Board was guided by studies made concerning other institutions throughout the United States which showed that approximately 65 percent of administrative costs went for salaries. The plaintiff has introduced no proof tending to show what salaries are reasonable or normal under comparable circumstances. The Board found that plaintiff was overstaffed with administrative personnel and that the president of the plaintiff institution *357 and his brother received unusually high salaries. Plaintiff introduced no evidence at the Board hearing or during the trial in this court to show that such salaries were reasonable and proper. The Board’s determination with respect to salaries is not shown to have been arbitrary or capricious, and it is supported by substantial evidence.
(b) In computing what it considered to be plaintiff’s fair and reasonable tuition rates, the Board disallowed the major portion of an interest item of $18,223.87. Some of this interest was incurred because the plaintiff, with heavy liabilities, contracted to purchase the assets of Technical and Hemphill which were valued at $818,391.03.
(c) The Board referred to the allowances of the Administrator of Veterans Affairs which granted plaintiff a 10 percent profit inasmuch as the school was treated as a profit institution. It was pointed out by the Board, however, that the school claimed to be a nonprofit institution and hence paid no taxes. On that basis the Board reduced the 10 percent profit allowance to 6 percent. After the hearings the Board determined the plaintiff’s costs, allowable profit, rates per student hour, and course charge for each of the six courses covered by contracts V3044V-675 and V3044V-678 as shown on following page.
42. Plaintiff has offered no additional evidence in support of a finding that the rate fixed by the VA in contracts V3044V-673 and V3044V-674 was unfair or unreasonable, but strongly insists that it is entitled to its customary tuition rates because of the Board’s finding that this case involves a nonprofit institution of higher learning.
43. Interest on any bank loans which are shown to have been necessary as a result of a withholding by the VA of approximately $500,000 due the school would be an allowable item in the school’s cost of operation.
The record clearly establishes that (1) the VA by regulation[7] made specific provision for payment of interest as a part of the administrative expense, and (2) the VA formulated and followed a firm, unpublished, policy of disallowing interest as an item of cost unless such interest was incurred and expended for loans made necessary because of un-

*358

*359 reasonable delay of the VA in making payments for services rendered. Some payments were subject to considerable delay, and such delay was in part responsible for the accumulation of the amount of $500,000 due and unpaid to plaintiff. In this case the VA disallowed all interest, including interest on mortgages.
The Hearing Examiner allowed interest on bank loans obtained in the regular course of business in the amount claimed, $2,613.40. He also allowed interest on mortgages in the amount of $3,154.74 “because such interest is normally a component part of rent, which would have to be paid in a reasonable amount regardless of whether the buildings were owned by West Coast or Technical Crafts.” He further pointed out that the Board had repeatedly held that a reasonable allowance in lieu of rent for premises occupied by a school and owned by the proprietor or other interested party is an includible expense.
The remainder of the interest claimed, in the amount of $12,455.73, was paid on obligations to Technical in connection with purchases of assets and facilities of that corporation. The Blearing Examiner disallowed this interest item with the following comment:
* * * [I] t has already been shown that West Coast purchased these assets without putting up any cash and that the entire transaction was an attempt to evade the impact of Change 9 and so to avoid submission of cost data for negotiation of fair and reasonable rates. * * *
The Board disallowed all interest except the item of mortgage interest in the amount of $3,154.74. The dis-allowance of the larger interest item of $12,455.73 (previously disallowed by the Examiner) is not considered to have been arbitrary or erroneous. It is found, however, that the Board’s disallowance of the interest on bank loans in the amount of $2,613.40 was arbitrary and unwarranted, in view of the VA regulation referred to above and the facts and circumstances existing at the time.
The VA allowed 10 percent profit, and the Hearing Examiner allowed a profit of % of the total cost.[8] The Board al *360 lowed only 6 percent profit, and cited one other case in support of its decision. Counsel for plaintiff insists that the ruling was arbitrary and capricious, citing one other case wherein he states the Board reached a different or opposite conclusion.
44. The Hearing Examiner held that the refusal of the YA to recognize the nonprofit status of West Coast University was ill-founded. The Board concurred in that finding, stating:
* * * We conclude that West Coast University was a nonprofit (tax-exempt) institution within the Veterans’ Administration regulations during the contract period under survey.
DEFENDANT’S AFFIRMATIVE DEFENSE AND COUNTERCLAIMS
45. Defendant has filed an affirmative defense alleging that if the court should hold that plaintiff was entitled to its customary rates for contracts V3044V-673 and V3044V-674, defendant will be entitled to recover the difference between the fair and reasonable rates and the rates contained in the said contracts for the period March 1,1949, to June 30,1949.
Defendant has also filed three counterclaims alleging that it is entitled to recover:
(a) The difference between the tuition rates specified in contracts V3044V-673, V3044V-674, V3044V-675, and V3044V-678 and the rates of the interim agreements.
(b) The difference between the rates set by the Veterans’ Education Appeal Board in contracts V3044V-675 and V3044V-678 and the rates fixed by the VA.
(c) The difference between the rates set by the Veterans’ Education Appeal Board in contracts V3044V-690 and V3044V-910 and the rates fixed by the VA.
It was agreed that these issues concerning the counterclaims and the amounts of recovery by defendant, if any, would be reserved for future proceedings.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment is entered to that effect.
*361 The amount of recovery will be determined pursuant to Eule 38 (c) of the Eules of this court.
In accordance with the opinion of the court and a memorandum report of the commissioner as to the amount due thereunder, it was ordered on September 4, 1964, that judgment be entered for the plaintiff for $11,654.38, and it was further ordered that defendant’s counterclaims be dismissed.

 Although plaintiff Insists that Section 106 of Change 4 has no application to plaintiff schools, a tax-exempt, nonprofit Institution, the section is quoted for ready reference by the court.

 A stipulation filed with the court provides that the parties may cite and rely on the administrative record which was before the Veterans’ Education Appeals Board. Exhibit 8-H attached to the stipulation and also included in the administrative record (joint exhibit 1) is the decision of the Board and contains a summary of the facts adduced before the Board.

 These courses given by Technical and Hemphill were trade school courses and not instruction ordinarily given by Institutions of higher learning. This is substantiated by the testimony of Mr. Bollay at the hearing before the Board. He was called by the plaintiff as a witness.

 The nonprofit status of plaintiff, Initially granted by the Internal Revenue Service on November 4, 1947, was never withdrawn. The nonprofit, tax-exempt status was reaffirmed on February 21, 1949, and again confirmed on January 8,1951, by the Internal Revenue Service.

 The reference is obviously to defendant’s Exhibit 14, which is plaintiff’s letter dated March 4,1949.

 The saving clause of Public Law 610, 81st Cong., 2d Sess., 64 Stat. 336, 339, provides: “Any educational or training institution which has a contract covering any period subsequent to August 24, 1949, shall be entitled to a review by the Veterans’ Education Appeals Board of the rate of tuition, fees and other charges established in such contract. * * *”

 Paragraph 80(b) (7) of Change 9.

 Defendant proposed a finding that the Board’s determination in this, respect was standard procedure. This statement is not considered to be accurate and is not supported by substantial evidence.